# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-CA-01518-SCT

*DAVIS SULLIVAN, M.D. AND GEORGE RODNEY MEEKS, M. D.*

*v.*

*BRODERICK WASHINGTON, MAURICE WASHINGTON, AND THE ESTATE OF DORISTEEN WASHINGTON, BY AND THROUGH DEIDRA THOMPSON AND BRODERICK WASHINGTON, ADMINISTRATORS FOR THEMSELVES, INDIVIDUALLY, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF DORISTEEN WASHINGTON, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/27/1998 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | FRANK A. WOOD, JR. |
| | MILDRED M. MORRIS |
| | SUSAN L. STEFFEY |
| | LANNY R. PACE |
| | MICHAEL V. CORY, JR. |
| | JIMMIE B. REYNOLDS, JR. |
| ATTORNEYS FOR APPELLEES: | ISAAC K. BYRD, JR. |
| | SUZANNE KEYS |
| | HIAWATHA NORTHINGTON, II |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND RENDERED - 8/17/2000 |
| MOTION FOR REHEARING FILED: | 8/31/2000; denied 10/26/2000 |
| MANDATE ISSUED: | 11/2/2000 |

### EN BANC.

### PITTMAN, PRESIDING JUSTICE, FOR THE COURT:

¶1. This is an appeal from a jury verdict and judgment of the Hinds County Circuit Court, First Judicial District, against Dr. Rodney Meeks and Dr. Davis Sullivan in the amount of $1.7 million. The complaint in this matter was filed on July 15, 1994, by Doristeen Washington[1] against Dr. Rodney Meeks, Dr. Davis Sullivan and Dr. John Isaacs. The complaint alleged that Washington suffered injury as a result of the defendants' negligent tubal ligation surgery at the University of Mississippi Medical Center ("UMC") on January 14, 1993, and their negligent failure to detect complications arising from the surgery. Without presenting any expert testimony concerning the alleged negligence during the tubal ligation, the plaintiffs abandoned the negligent surgery claim, but the plaintiffs amended the complaint on the first day of trial, over

the objections of the defendants, to allege lack of informed consent.

¶2. The defendants denied any negligence. Discovery proceeded, and the case was tried from May 11 to 21, 1998. The jury returned a verdict against Dr. Meeks and Dr. Sullivan in the amount of $1.7 million but found no liability by Dr. Isaacs. Judgment was entered accordingly. Drs. Meeks and Sullivan filed motions for judgment notwithstanding the verdict, or in the alternative, for new trial, but the court denied the motions. From this judgment Meeks and Sullivan timely appealed.

## STATEMENT OF THE FACTS

¶3. From January 14-24, 1993, Doristeen Washington was a 37-year-old mother of two who at the time of the surgery was obese and was suffering from multiple sclerosis, pelvic inflammatory disease, and hypertension. Concerned that another pregnancy might aggravate her multiple sclerosis and convinced that she could not care for another child, Washington elected to have a tubal ligation.

¶4. Dr. Sullivan was initially scheduled to perform the tubal ligation with Dr. Meeks as the admitting and attending physician for the surgery. Dr. Isaacs, however, actually performed the tubal ligation on January 14, 1993, because Dr. Sullivan had been assigned to another part of the hospital at the time of the surgery. Dr. Isaacs initially successfully located and ligated the left fallopian tube. When Dr. Isaacs attempted to locate the right fallopian tube, he could not due to the presence of numerous adhesions in Washington's bowel. In order to locate the right tube and complete the tubal ligation, Dr. Isaacs had to convert the surgery from a laparoscopy to a laparotomy.

¶5. After Dr. Isaacs converted to a laparotomy, he began cutting back the adhesions in Washington's abdomen. At this time, Dr. Sullivan came to the surgical suite and assisted Dr. Isaacs for the remainder of the procedure, which included ligating the right fallopian tube and closing the abdomen.

¶6. On January 15, 1993, Washington developed respiratory difficulty and an increased heart rate. Over the next three days, Washington's condition worsened, and on January 17, 1993, she developed signs of sepsis (i.e., an infection) and was started on antibiotics. On January 18, 1993, Washington was moved to UMC's Medical Intensive Care Unit ("MICU"), while Dr. Sullivan continued to follow her progress. Pulmonary physicians reviewed Washington's chest x-rays and noted the presence of pleural effusions and infiltrate in the lungs (i.e., an area of darkening consistent with pneumonia). She remained in the MICU at UMC until January 24, 1993.

¶7. On the morning of January 24, 1993, Washington's condition began to deteriorate dramatically. In response to this change, pulmonary physicians requested a surgical consult with Dr. Edward Rigdon. X-rays taken at this time showed the presence of free air in her abdomen, indicating a probable bowel perforation. During the exploratory laparotomy, Dr. Rigdon found and resected two perforations in Washington's bowel.

¶8. After Dr. Rigdon resected the two perforations, he inspected the remainder of Washington's colon to make sure that there were no other perforations. After finding no other perforations, Dr. Rigdon completed the procedure by performing a diverting iliostomy. Dr. Rigdon then sent a tissue sample from the resected portion Washington's bowel to the pathology lab for analysis, which revealed evidence of ulceration.

¶9. On March 24, 1993, Dr. Rigdon operated again to close the iliostomy, and at this time, he discovered a third perforation, which apparently had developed since his January 24 procedure. He resected this third perforation. Washington remained in the hospital until June 2, 1993, when she was discharged to the

Methodist Rehabilitation Center due to her multiple sclerosis.

## STATEMENT OF THE ISSUES

¶10. Dr. Meeks raises the following issue:

**I. WHETHER PLAINTIFFS OFFERED SUFFICIENT MEDICAL TESTIMONY AGAINST MEEKS TO SUPPORT THE JURY VERDICT.**

¶11. Drs. Meeks and Sullivan raise the following issues:

**II. WHETHER THE LACK OF INFORMED CONSENT CLAIM AND INSTRUCTION WERE WARRANTED BY THE EVIDENCE AND PROPERLY PLACED BEFORE THE JURY.**

**III. WHETHER THE JURY VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**IV. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING EVIDENCE OF MEDICAL BILLS OF DORISTEEN WASHINGTON.**

**V. WHETHER THE JURY WAS A FAIR CROSS-SECTION OF HINDS COUNTY.**

**VI. WHETHER COUNSEL FOR THE PLAINTIFFS INTENTIONALLY INCITED BIAS AND PREJUDICE**.

**VII. WHETHER PLAINTIFFS' CLOSING ARGUMENTS VIOLATED THE "GOLDEN RULE" AND IMPERMISSIBLY ENCOURAGED THE JURORS TO BECOME ADVOCATES FOR THE PLAINTIFFS.**

**VIII. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO ALLOW AN APPORTIONMENT INSTRUCTION.**

**IX. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GRANT JUDGMENT AS A MATTER OF LAW FOR DEFENDANTS ON THE BASIS OF SOVEREIGN IMMUNITY WHERE THE ALLEGED CAUSE OF ACTION ACCRUED IN JANUARY 1993 AND DEFENDANTS WERE EMPLOYEES OF A STATE HOSPITAL AND UNIVERSITY**.

## DISCUSSION

¶12. This Court need address only the dispositive issue in this appeal:

**IX. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GRANT JUDGMENT AS A MATTER OF LAW FOR DEFENDANTS ON THE BASIS OF SOVEREIGN IMMUNITY WHERE THE ALLEGED CAUSE OF ACTION ACCRUED IN JANUARY 1993 AND DEFENDANTS WERE EMPLOYEES OF A STATE HOSPITAL AND UNIVERSITY.**

¶13. This Court does not find it necessary to visit the several issues in this case because the outcome is

controlled by Miss. Code Ann. § 11-46-7(2) (amended 1991).

¶14. After the final presentation of evidence, Meeks and Sullivan moved for a directed verdict arguing that the Sovereign Immunity Act which was in effect during January 1993 required a judgment as a matter of law. Their motion was denied because the judge refused to dismiss the defendants on an immunity issue at the end of a two-week trial. Given the applicable law at the time of the alleged negligence, however, Drs. Meeks and Sullivan must prevail.

¶15. The applicable statute which determines the outcome of this case is Miss. Code Ann. § 11-46-7(2) (amended 1991) which provides:

> From and after July 1, 1992, as to state, and from October 1, 1992, as to political subdivisions, an employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.

This Court has previously held in *Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc.*, 735 So.2d 993, 996 (Miss. 1999), that § 11-46-7(2) (amended 1991) applied to actions that accrue between September 16, 1992 until April 1, 1993. In fact, *Jones* involved three nurses who were sued individually for failure to diagnose properly and treat a patient from January 29 to January 31, 1993. This Court held that the Circuit properly dismissed the nurses pursuant to § 11-46-7(2).

¶16. Similarly, Drs. Meeks and Sullivan were sued individually for negligence alleged during the ten-day period from January 14 to January 24, 1993. There was no dispute that Drs. Meeks and Sullivan were employees of UMC acting withing the course and scope of their employment. Furthermore, facts gleaned from the record indicate that Washington was a Medicaid patient who did not choose any particular doctor. Drs. Meeks and Sullivan were assigned Washington in accordance with their duties at UMC as a public hospital and an educational institution. Drs. Meeks and Sullivan were sued individually in clear contradiction to the applicable statute.

¶17. Although not raised on appeal, the recent judgment by this Court in *Miller v. Meeks*, No. 1999-CA-00210-SCT, 2000 WL 863167 (Miss. June 29, 2000), requires that a brief analysis be conducted concerning the employment status of Drs. Meeks and Sullivan for purpose of the Sovereign Immunity Act. *Miller* enumerates a five-part test for determining the employment status of doctors at public hospitals:

> 1. the nature of the function performed by the employee;
>
> 2. the extent of the state's interest and involvement in the function;
>
> 3. the degree of control and direction exercised by the state over the employee;
>
> 4. whether the act complained of involved the use of judgment and discretion;
>
> 5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.

*Id*. at *7-8.

¶18. The nature of the function performed by Dr. Meeks was supervisory. He was Washington's admitting physician for purposes of the surgery and the attending physician who supervised the tubal ligation performed by Drs. Isaacs and Sullivan. He was acting in his capacity as a supervisor and did not have a private-patient relationship with Washington; rather, he was serving a public function by providing care for a Medicaid patient. Dr. Sullivan performed part of the surgery, along with Isaacs, and continued to follow Washington's progress. Dr. Sullivan was a resident and performed Washington's surgery in accordance with his position. The nature of this function was one of continued education in furtherance of Sullivan's career path of becoming a physician. Like Dr. Meeks, Dr.Sullivan did not have a private-patient relationship with Washington.

¶19. The State has a keen interest in cases of this nature. It is very important that faculty physicians supervise the progress of interns and residents. This provides the training necessary to ensure that Mississippi has a ready pool of competent physicians. Likewise, the resident must be able to practice medicine under the guidance of a learned physician in order to master his or her profession. The State has a strong interest in maintaining such a practical and educational environment, meeting the needs of both the physicians and the patients. Concerning the patient, UMC is fulfilling its operational purpose under Miss. Code Ann. § 37-115-31 (1996)[2] by providing care to Washington, a Medicaid patient.

¶20. Dr. Meeks was the staff physician assigned to the operating room that day to supervise Isaacs and Sullivan during the tubal ligation. Other than admitting Washington to the hospital and transferring her care, according to regulations, to the Gyn-Endocrine department when the surgery was completed, Dr. Meeks took no further interest in Washington and was under no duty to do so. Consequently, the direction and control of UMC over Dr. Meeks was significant in this instance.

¶21. Likewise, the fact that Dr. Sullivan was obligated to fulfill his residency requirement shows a certain amount of control exercised by UMC. Furthermore, UMC required that Dr. Meeks supervise Dr. Sullivan during the operation. There was less control exercised over the actual performance of the surgery and subsequent diagnosis and treatment. There was control, however, in the form of regulations and a hierarchical power structure in which Sullivan, as a resident, had little decision-making power over the course of Washington's treatment. Also, neither Dr. Meeks nor Dr. Sullivan chose Washington as a patient or were chosen by her.

¶22. The supervisory acts of Dr. Meeks involved little judgment or discretion. From the record, it is evident that Dr. Meeks played a very small role in Washington's surgery, diagnosis and treatment. Dr. Sullivan, however, exercised an amount of judgment and discretion in his treatment, observations and diagnosis of Washington. While this is a consideration, it is not determinative. Virtually every act performed by a person involves the exercise of some discretion. Obviously, a professional necessarily retains a significant amount of discretion in the operation of his profession. This is especially true of physicians who are bound to exercise their judgment without interference from others. The Hippocratic Oath requires that the physician " . . . use [his] power to help the sick to the best of [his] ability and judgment." Section 6 of the American Medical Association's "Principles of Medical Ethics" states, "A physician should not dispose of his services under terms or conditions which tend to interfere with or impede the free and complete exercise of his medical judgment and skill . . . ."

¶23. Concerning compensation, Washington was a Medicaid patient from whom neither Dr. Meeks nor Sullivan received remuneration directly. Although Meeks worked in a private clinic, Washington was not

Dr. Meeks's patient, and as noted previously, Washington's expenses were covered through Medicaid. As required by the vice chancellor of the medical center, Washington was billed through the various groupings of all the staff physicians according to their practice divisions. For example, Dr. Meeks was a member of the University of Ob/Gyn Associates, a group or "practice plan" which handled billing for that service.[(3)] As a resident, Dr. Sullivan received a set salary from UMC and was not a member of the University of Ob/Gyn Associates. As noted previously, the operational purpose of UMC is to treat a significant number of Medicaid patients. *See* Miss. Code Ann. § 37-115-31.

## CONCLUSION

¶24. After review of the Sovereign Immunity Act and the test enumerated in ***[Miller v. Meeks]***, this Court finds that Dr. Meeks and Dr. Sullivan are employees of UMC and the State for purposes of liability under the Sovereign Immunity Act. Consequently, the judgment of the Hinds County Circuit Court denying Dr. Meeks's and Dr. Sullivan's JNOV motion is reversed, the jury award overturned, and judgment is rendered here for Dr. Meeks and Dr. Sullivan finally dismissing the plaintiffs' amended complaint and this action with prejudice.

¶25. **REVERSED AND RENDERED.**

**PRATHER, C.J., SMITH, MILLS AND WALLER, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND DIAZ, JJ. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., AND DIAZ J. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION**.

**BANKS, PRESIDING JUSTICE, DISSENTING:**

¶26. I respectfully disagree with the majority's conclusion pertaining to a victim's right to recover during an uneasy time in our sovereign immunity jurisprudence. Because of the time period when Washington's injuries occurred, if the sovereign immunity statute is enforced she is left without a remedy at all for the actions of a governmental employee. In my view this is a clear constitutional violation. Article 3, Section 24, of the Mississippi Constitution of 1890 provides: "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, **shall have remedy by due course of law**, and right and justice shall be administered without sale, denial or delay." (emphasis added).

¶27. This Court has held that the remedies clause is no impediment to the legislative grant of sovereign immunity to government entities, primarily because, there was such immunity at the time of the adoption of the clause. ***[Mohundro v. Alcorn County]***, 675 So.2d 848, 851 (Miss. 1996); ***Wells v. Panola County Bd. of Educ.***, 645 So.2d 883, 892 (Miss. 1994). However, the answer that the tort claim act does not detrimentally affect a common law right because there was no cause of action against the sovereign at common law, does not hold true for state employees. We have never squarely addressed the issue whether the remedies clause of Section 24 of our constitution is violated by legislation which immunizes state employees from suit. I suggest that we answer the question in the affirmative.

¶28. Where the state legislature seeks to abolish a common law remedy the question to be answered is whether a reasonable substitute for the remedy is embodied in the legislation. ***Bonin v. Vannaman***, 261 Kan. 199, 929 P.2d 754 (1996); ***Rajala v. Doresky***, 233 Kan. 440, 661 P.2d 1251 (1983); ***Wells v.***

***Panola County Bd. of Educ.***, 645 So.2d 883 (Miss. 1994); ***Walters v. Blackledge***, 220 Miss. 485, 71 So. 2d 433 (1954); ***Texas Workers' Compensation Comm'n v. Garcia***, 893 S.W.2d 504 (Tex. 1994); ***Warren v. Melville***, 937 P.2d 556 (Utah Ct. App. 1997); ***Bair v. Peck***, 248 Kan. 824, 811 P.2d 1176 (1991).

¶29. In ***Warren***, the Utah court held that, "We recognize that under the open courts provision, a reasonable alternative remedy is required, but this does not amount to an exact equation of remedies. 937 P.2d at 560. Such limitations allow for legislative substitutes which protect an individual's due process rights and are still within the boundaries of that particular state's remedies clause. Thus the court first determines whether the individual's rights have been limited by a particular statute. If so, it then determines if an adequate substitute remedy has been provided to replace it. ***Bair***, 248 Kan. at 840.

¶30. Different states have various methods of determining whether the legislature's substitute for an abolished cause of action violates the remedies clause. In ***Bair v. Peck***, the Kansas Supreme Court a devised a test to determine whether the substitute remedy violated the Kansas Constitution's remedies clause. The test was whether the substitute remedy would have been sufficient if the modification had been part of the original act. If so, then no new substitution is necessary to support the modification against a remedies clause attack. Any other holding would require that every modification of a substitute remedy that abrogated a common law remedy would require a new and additional substitute remedy. ***Bair***, 248 Kan. at 843.

¶31. In ***Bair***, the Kansas Health Care Provider Insurance Act eliminated the vicarious liability of health care providers. Kansas requires an adequate substitute remedy before the legislature can abolish a common law remedy. ***Id.*** at 840. The court did not accept the defense argument of the need to protect affordable continuing health care. "If not for negligent health care providers, then victims would not need the continuing health care. Plus, health care providers have been required to carry malpractice insurance since 1976. ***Id***. at 840. However, the court did find an acceptable substitute. Although the statute eliminated the plaintiff's right to receive non-economic losses in excess of $250,000 the court found an adequate substitute in that the legislation prevented the court from exercising its discretion to award less than $250,000 when higher damages were awarded by the jury. ***Bair***, 248 Kan. at 840 (quoting ***Samsel v. Wheeler Trans. Servs., Inc.,*** 789 P.2d 541 (Kan. 1990)). "Statutory modification of the common law must meet due process requirements and be reasonably necessary in the public interest to promote the general welfare of the people of the state. Due Process requires that the legislature substitute the viable statutory remedy of quid pro quo (this for that) to replace the loss of the right." ***Id.*** at 840.

¶32. In another Kansas case, ***Rajala v. Doresky***, the court determined that sections of Workers' Compensation statutes which preclude persons from maintaining civil damage actions against fellow employees for any injury for which compensation is recoverable under Workmen's Compensation are not violative of the remedies clause. ***Rajala***, 233 Kan. at 440. The court decided that it is not its prerogative to modify such legislative determination by judicially carving out an exception for intentional torts. ***Id.*** at 440. The Workers' Compensation Act removed certain common law remedies for injured employees but provided a statutory substitute thereof. ***Id.*** at 441. The court determined that this was also a public policy issue and that it was better addressed by the legislature. ***Id.*** at 441. The issue was addressed at the next regular session, and the act was amended to extend immunity from civil liability to fellow employees. ***Id.*** at 442. The legislature determined it better public policy to preclude a person from maintaining a civil damage action against a fellow employee for any injury for which compensation is recoverable under the workers'

compensation act. *Id.* at 442.

¶33. Utah uses a slightly different test to determine whether the substitute remedy is in violation of the remedies clause. In *Warren v. Melville*, the court held that the no-fault insurance rule did not violate the open court remedies clause. *Warren*, 937 P.2d at 556. The court used a two-part *Berry* test: (1) Is there a reasonable alternative? (2) Does the statute eliminate a clear social or economic evil? *Id.* at 561. The court recognized that a reasonable alternative remedy is required, but this does not amount to an exact equation of remedies. *Id.* at 560. It held that the no-fault statute provides a reasonable alternative under the open court provision because the injured party is assured a speedy payment of his or her medical bills and compensation for lost income from their own insurer even where the injured party was clearly at fault. *Id.* at 560. Utah's No-Fault statute provides individuals damaged in auto accidents a reasonable alterative remedy because it:

> a. Provides for recouping pecuniary losses by mandating recovery of all special damages

> b. Places a reasonable dollar limit on the general damage monetary threshold to accomplish the statute's objectives.

*Id.* at 561.

¶34. The statute does not affect a tort victim's ability to completely recover pecuniary losses nor does the statute interfere with a tort victim's ability to collect out of pocket expenditures. *Id.* at 561. It merely limits the ability to recover damages for pain and suffering. It also does not limit a plaintiff's ability to recover for special damages.

¶35. Like Utah's No-Fault Statute, the Workers' Compensation Act disregards the issue of fault in lieu of prompt, efficient payment of benefits to beneficiaries for certain losses. In Texas the court devises the test from a similar situation in a worker compensation case. In *Texas Workers' Compensation Comm'n v. Garcia*, the court held that, "The question as to whether the legislatively created remedy is a reasonable alternative is best decided by viewing in the aggregate the remedies which the act provides." *Id.* at 523. The court determined that each act did not need to be replaced so long as the bulk of the remedies be of significance such that the court is justified in viewing them as a whole, sufficient as a substitute. *Id.* at 523.

¶36. Courts in Florida and Texas have determined that restrictions placed on tort victims for non-economic losses violated the victim's constitutional right to access of the courts. *Smith v. Department of Ins.*, 507 So.2d 1080 (Fla. 1987); *Lucas v. United States*, 757 S.W.2d 687 (Tex. 1988). *Smith* held that sections of the Tort Reform and Insurance Act which placed a $450,000 cap on damages that tort victims could recover for non-economic losses, violated Art. 1 § 21 of the Florida Constitution, the Remedies Clause provision. The court held, "There currently exists a right to sue on and recover non-economic damages of any amount and this right existed at the time the current Florida constitution was adopted." *Smith*, 507 So.2d at 1087. The court stated that there is no distinction placed between economic and non-economic damages in right to remedy of any injury. *Id*. at 1087. The remedies clause also does not contain any language which would support the proposition that the right is limited, or may be limited. *Id*. at 1087. The government cannot make these types of restrictions unless they fall under two exceptions. Either they must provide a reasonable alternative remedy, or commensurate benefit or legislatively show an overpowering public necessity for the abolishment of the right and no alternative method of meeting to suit public necessity. *Id*. at 1088. Otherwise, there is no reasonable trade-off of remedy for benefit.

¶37. An example of this is the no-fault statute. The no-fault statute is the right to sue in exchange for the right to recover uncontested benefits. However in the *Smith* case there is no equal footing similar to the no-fault rule. A medical patient or client of a lawyer obtains no compensatory benefit from a cap placed on non-economic damages because of the unlikeliness of negligence by a patient or client. *Id.* at 1088. Access to court is granted for the purpose of redressing injuries. *Id*. at 1088. A plaintiff who receives a jury verdict for $1 million has not received a constitutional redress of injuries if the legislature statutorily and arbitrarily caps the recovery at $450,000. The plaintiff is also not receiving the constitutional benefit of a jury trial. *Id*. at 1088. The court also held that the constitutional right of redress of injuries should not be subject to or subordinated to legislative grace.

¶38. The legislature's major purpose in capping non-economic damages was to assure available and affordable insurance coverage for all citizens. However, the court held that this is a constitutional right which may not be restricted just because the legislature thinks it rational to do so. *Id*. at 1089. The court saw no way in which there was any alternative remedy given nor how the restriction was benefitting the tort victim.

¶39. In *Lucas v. United States*, the Texas court found that damage limitations violated their remedy clause as well. The court used a two-part test from *Sax v. Votteler*, which states that in looking at a litigant's right to redress, there are two criteria to satisfy. First, it must be proven that litigant has a cognizable common law cause of action that is being restricted. Second, the litigant must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Sax v. Votteler*, 648 S.W. 2d 661, 666 (Tex.1983). Since Texas courts have already recognized a common law cause of action for victims of medical negligence, only the second part of the test needed to be analyzed. In *Lucas* the court found that the legislature failed to provide Lucas with any adequate substitute to obtain redress for his injuries. Suggestions of adequate substitute remedies such as the Patient Compensation Fund created in Indiana and Louisiana or the Victim Compensation Fund that was suggested by a study done in the Texas legislature, were noted by the court. *Id*. at 691. However, since none of these funds were presently in place, the lack of sufficient redress was unconstitutional. The court rejected the defense's argument that the restriction, as a modification in an effort to address the medical malpractice insurance crisis, was reasonable when balanced against the purpose of the statute. *Id*. at 691. The court held that the Texas remedy clause guarantees meaningful access to the courts whether or not liability rates are high and that the power to assure that awards are rationally related to actual damages is one reserved for the judicial and not legislative branch of government.

¶40. The legislation here at issue does not provide a no-fault remedy. It provides no remedy at all. This is a "window" case. That is, it involves alleged negligence that occurred at a time when the legislature had declared immunity for itself and, most importantly, its employees but had not yet provided a tort claims system that allowed even limited recovery. Because injured parties were deprived of the pre-existing common law remedy without providing any remedy whatever as a substitute and because there was certainly no overpowering public necessity to do so, I would hold that Miss. Code Ann. § 11-46-7(2), as it existed for the period July 1, 1992 through April 1, 1993 and as it relates to state employees, unconstitutional as violative of Article 3, Section 24 of the Constitution of the State of Mississippi.

**McRAE AND DIAZ, JJ., JOIN THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶41. While it is clear that the University Hospital is an essential part of the University of Mississippi Medical School and the training of its students, its importance by no means overshadows the health and well-being of this state's citizens who seek medical treatment. The majority opinion implies that the strongest argument in favor of shrouding teaching physicians with sovereign immunity is the state's "keen interest" in teaching and producing competent physicians. Although it is a compelling argument, it is implausible to suggest that negligent acts performed by physicians during treatment of patients in some way furthers this goal. "The physician owes his best professional skill and judgment in treating his patient, and the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in a private practice." *James v. Jane*, 282 S.E.2d, 864, 867-68 (Va. 1980). Accordingly, I dissent.

¶42. Doristeen Washington ("Washington") entered the University of Mississippi Medical Center ("UMC") to undergo a tubal ligation. Dr. Meeks was the admitting and attending physician for surgery and was present for part of the surgery. Dr. Sullivan took part in the operation and assisted in ligating the right fallopian tube and closing the abdomen on January 14, 1993. Over the next several days Dr. Sullivan continued to follow Washington as she spiraled downward. On January 24, 1993, there was a dramatic change, and Washington's condition worsened to the point that another physician, Dr. Rigdon, had to perform an exploratory laparotomy, during which he found and resected two perforations in Washington's bowel.[4] Nearly five months after arriving at UMC for a tubal ligation, Washington was finally discharged.

¶43. There is strong evidence that both Dr. Meeks and Dr. Sullivan were acting in a dual capacity while caring for Washington and should be personally liable for any negligence on their part. As independent contractors, neither Dr. Meeks nor Dr. Sullivan are entitled to protection under the Tort Claims Act. Miss. Code Ann. § 11-46-1(f) (Supp. 1999). Looking to the test enumerated in ***Miller v. Meeks***,[5] it is clear that Meeks and Sullivan cannot escape liability under the Act.

### 1. The Nature Of The Function Performed By The Employee

¶44. Dr. Meeks was a fully qualified physician and also worked at a private clinic. Dr. Sullivan was a resident and received a set salary from UMC. In most cases such as this, students learn by observing and assisting in the care and treatment of patients. The duties of the physicians instructing patients is generally two-fold. They will instruct University students and will also treat patients in the presence of students, interns and residents. As an understood part of this arrangement, the physician is required to use reasonable care in carrying out his duties.

¶45. Although Dr. Meeks did not render any direct treatment to Washington, his supervision occurred as a part of patient care, not as part of insuring a reputable medical school. The Supreme Court of Virginia interpreted this part of the ***James v. Jane*** test to find that an attending physician/professor who "supervised" the delivery of a child but gave no instruction, nor had personal contact with the mother, could not be protected by sovereign immunity. ***Lee v. Bourgeois***, 477 S.E. 2d 495 (Va. 1996). The Court held that as the attending physician, Dr. Bourgeois's function was more than simply being available to consult with residents, his primary function was related to the treatment of patients. ***Id.*** at 498. The same can be said for Dr. Meeks.

¶46. Despite the fact that the University provides the facilities and staff, when the physician agrees to treat on a particular patient, although the opportunity arises out of his employment with the University, "the relationship becomes the personal and confidential one of doctor and patient," not the State of Mississippi

and patient.

## 2. The Extent Of The State's Interest And Involvement In The Function

¶47. While it is obvious that the State of Mississippi and UMC have a great interest in operating a successful medical school and in graduating competent doctors, the state also has an interest in seeing that the patients who enter UMC receive proper care and adequate medical treatment. The state's interest, in its sovereign capacity, in the actual treatment of a patient by an attending or supervising physician at UMC is slight, as is the amount of control exercised by the state over the physician in the treatment of that patient. Whatever interest the state may have, it is not enough to warrant granting its physicians immunity intended for state officials. The actions complained of by Washington related to the provision of patient care, not the education function of the faculty members. As a result, the state's interest is slight. In addition, while the majority stresses that patients are not lost in the equation and that Miss. Code Ann. § 37-115-31 (1996) provides for the free treatment of those on medicaid, it loses sight of the fact that it is the **quality** of the treatment, not the cost, which is of concern.

## 3. The Degree Of Control And Direction Exercised By The State Over The Employee

¶48. The extent of this state's control and direction of the doctors within UMC is also a factor to be considered in claims of immunity. A high level of control by the state tilts the scale towards immunity, a low level away from it. The majority makes an attempt at a smoke screen in stressing the fact that Dr. Sullivan was obligated to fulfill his residency requirement and that Dr. Meeks was required to "supervise" during the operation and that this somehow points to control by the state. While the state may have required that both Dr. Sullivan and Dr. Meeks care for patients such as Mrs. Washington, it did not hover over their shoulders during the operation and give directions or in any way interfere with their discretionary decision making power. The acts involved the exercise of professional medical judgment, a function outside the control of the State. "When a government employee is specially trained to make discretionary decisions, the government's control must necessarily be limited in order to make maximum use of the employee's special training and subsequent experience." *Lohr v. Larsen*, 431 S.E.2d 646 (Va. 1993).

## 4. Whether The Act Complained Of Involved The Use Of Judgment And Discretion

¶49. While the majority concedes that Dr. Sullivan did in fact exercise an amount of judgment and discretion in his treatment, observation, and diagnosis of Washington, it claims that the role of Dr. Meeks involved little judgment. Considering the fact that Dr. Meeks was actually "supervising" the treatment of Washington, nothing could be further from the truth. The broad discretion granted to both Dr. Sullivan and Dr. Meeks was not attendant to actions that were integral to the state's interest or function, and thus immunity cannot attach.

¶50. This Court has addressed issues regarding governmental discretion and sovereign immunity in such situations and have held that governmental immunity was created to protect flawed administrative decisions, not medical malpractice. *Womble v. Singing River Hosp.*, 618 So.2d 1252 (Miss. 1993)(citing *Henderson v. Bluemink*, 511 F.2d 399 (D.C.Cir. 1974)). Indeed,

> The chief policy underlying the creation of immunity for lower governmental officials is mainly that which stems from the desire to discourage "the fearless, vigorous, and effective administration of policies of government." However, that policy is not applicable to the exercise of normal medical

discretion since doctors making such judgments would face the same liability outside of government as they would face if the complaint below is upheld. [Therefore], the threat of liability for negligence would not deter the fearless exercise of medical discretion within government service any more than the same threat deters the exercise of medical discretion outside of government. Holding government medical personnel to the same standards of care which they would face outside of government service in no way burdens their public responsibility or deters entry into government service or the vigorous exercise of public responsibility once having entered that service.

*Id.* at 402-03; *Womble*, 618 So.2d at 1264 (emphasis added).

### 5. Whether The Physician Receives Compensation, Either Directly Or Indirectly, From The Patient For Professional Services Rendered

¶51. The majority is correct in pointing out that since Washington was a Medicaid patient neither Dr. Meeks nor Dr. Sullivan received payment directly. However, both physicians benefitted indirectly as the fees paid by Medicaid were used in operating the medical school, which paid the physicians' salaries and assisted in the funding of their retirement benefits.

¶52. Although UMC is a teaching institution, patients there should not expect lower quality treatment. In fact, the physicians at UMC are widely regarded as some of the best in the State of Mississippi. There is no doubt that physicians at UMC have undertaken significant and important work. However, these physicians should not be rewarded by compromising and limiting the rights of their patients. Working at UMC does not expose physicians to any greater threat of suit than would otherwise be expected in private practice. There are more than adequate protections found within UMC and state law that alleviate the need to grant blanket immunity to physicians and residents employed there.

¶53. Moreover, the practical application of the majority opinion is immensely flawed. Consider the following: two individuals choose to undergo tubal ligation. One enters the University of Mississippi Medical Center and the other enters Mississippi Baptist Medical Center. If negligence occurs in both situations by the treating physicians and both patients suffer injuries, the patient who, by chance, entered UMC has no rights to recover from the individual physician for her injuries, while the patient at Mississippi Baptist Medical Center does. Furthermore, in some occasions such as emergencies, patients do not actually have a "choice" in which hospital they seek treatment. Such a bizarre rationale cannot be ignored. Creating immunity for doctors working for state hospitals, **just because they work for state hospitals**, creates a disturbing result.

¶54. The majority gives total immunity to doctors who supervise and train people to become doctors, as well as those trainees, to treat and experiment on the poor and indigent. This does violence to our constitution which states that where there is a wrong there is a redress. Miss. Const. art. 3, § 24. A society is judged by how it treats its poor and incompetents. It is wrong when we allow the poor to be used basically as guinea pigs in order to train doctors so that they can go out and charge people who have money to pay for their treatment. Just like insurance, Medicaid is nothing but a guarantee of money. It is wrong for the federal government to pay any private or public entity healthcare provider to treat the poor and not to allow them to have the same quality care as available in a private hospital.

¶55. The judgment of the circuit court denying Dr. Meeks's and Dr. Sullivan's JNOV motion should be affirmed and the jury verdict rendered in favor of Washington. Accordingly, I dissent.

**BANKS, P.J., AND DIAZ, J., JOIN THIS OPINION.**

1. Washington died in November 1996 of causes unrelated to the alleged negligence in this action. Her heirs and estate were substituted as plaintiffs prior to trial.

2. Miss. Code Ann.§ 37-115-31 (1996) provides that, "There shall be a reasonable volume of free work; however, said volume shall never be less than one-half of its bed capacity for . . . qualified beneficiaries of the State Medicaid Program."

3. From a review of the record, it appears that the University of Ob/Gyn Associates handles billing for UMC and is not a private clinic. Regardless, Dr. Meeks does not bill directly to patients, and even if he received indirect compensation from the University of Ob/Gyn Associates, at worst, four of the five factors would weigh heavily in favor of Dr. Meeks as an employee: factors 1, 2, 3, and 4. With no single factor being dispositive, Dr. Meeks must prevail. Likewise, four of the five factors weigh heavily in favor of Dr. Sullivan: factors 1, 2, 3 and 5.

4. Dr. Sweet, an obstetrics and gynecology professor at the University of Pittsburgh, testified as an expert witness for Washington that the perforation in Washington's bowel should have been diagnosed on the evening of January 17 or on January 18, 1993, and an abdominal x-ray should have been taken at this time which might have revealed free air.

5. No. 1999-CA-00210-SCT, 2000 WL 863167 (Miss. June 29, 2000).