# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00440-SCT

### Consolidated with

### NO. 2000-IA-00964-SCT

*SANDRA MOZINGO AND THOMAS MOZINGO,*
*INDIVIDUALLY, AND AS PARENTS AND CO-*
*GUARDIANS OF THE MINOR THOMAS (T.J.)*
*MOZINGO, JR.*

*v.*

*STEVEN M. SCHARF AND UNIVERSITY*
*ANESTHESIA SERVICES, PLLC d/b/a*
*UNIVERSITY ANESTHESIA GROUP*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/2000 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SUSAN LOUISE DURHAM |
| | BOBBY L. DALLAS |
| | BRAD SESSUMS |
| | J. ROBERT SULLIVAN, SR. |
| | HARRIS SULLIVAN, JR. |
| ATTORNEYS FOR APPELLEES: | WHITMAN B. JOHNSON III |
| | STEPHEN P. KRUGER |
| | ADRIENNE DENISE COX |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 10/24/2002 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On behalf of their son T.J., Sandra and Thomas Mozingo filed a medical malpractice suit against Steven M. Scharf, M.D., and University Anesthesia Services, PLLC (UAS) for injuries that T.J. received while he was under the care of Dr. Scharf on March 27, 1997. On September 4, 1998, Dr. Scharf and UAS filed a motion to dismiss the complaint filed against them on the grounds that it failed to state a claim for which relief can be granted because Dr. Scharf was a University of Mississippi Medical Center ("UMMC") employee and as such was entitled to sovereign immunity pursuant to the Mississippi Tort Claims Act ("MTCA"), Miss. Code Ann. § § 11-46-1 to - 23 (2002). In response, the Mozingos filed a motion for partial summary judgment requesting the trial court review the immunity issue and find that Dr. Scharf was not immune from liability. The trial court issued an order on February 11, 2000, denying the Mozingos' motion for partial summary judgment and granting Dr. Scharf's summary judgment motion. The trial court ruled that the MTCA applied to the case, that Dr. Scharf was entitled to immunity, that UAS is a governmental entity, and further that UAS waived its immunity only to the extent of the liability insurance coverage it carried for itself. The trial court entered a final judgment in Dr. Scharf's favor pursuant to M.R.C.P. 54(b). Aggrieved by the trial court's judgment, the Mozingos filed a timely notice of appeal to this Court on March 13, 2000. Applying the ***Miller*** factors, we conclude that summary judgment was proper. We accordingly affirm the trial court.

## FACTS

¶2. T.J. Mozingo ("Mozingo") was born on November 9, 1992, with a congenital heart defect which required him to undergo surgery to install a pacemaker. On February 17, 1997, approximately five years after he received his first pacemaker, a doctor evaluated Mozingo, determined that his pacemaker needed to be replaced, and scheduled replacement surgery for him. On March 25, 1997, Mozingo was admitted to UMMC for pacemaker replacement surgery. On March 27, 1997, at 7:30 a.m., Mozingo was taken to the operating room for surgery. There Dr. Steven M. Scharf, along with an intern, began induction of anesthesia. When the surgeon arrived approximately thirty minutes later, he questioned whether the electrocardiogram leads were functioning correctly and asked Dr. Scharf if the patient was okay. Mozingo's pulse was checked, and no pulse was found. It was determined that Mozingo was in cardiac arrest, a defibrillator was ordered by the attending surgeon, and Dr. Scharf began CPR. Mozingo's circulation and heart rate were then re-established. The surgeon continued with the pacemaker replacement surgery and when it was complete, Mozingo was taken to pediatric intensive care where an EEG revealed severe bilateral encephalopathy, or brain damage. The Mozingos filed a medical malpractice action on behalf of their son against Dr. Scharf alleging that he was negligent in providing care to T.J. When asked what occurred on the morning of March 27, Dr. Scharf replied, "I am unable to say what caused the heart arrhythmia that was the probable and ultimate cause of the child's current condition."

¶3. In March 1997, Dr. Scharf was employed by the Board of Trustees of State Institutions of Higher Learning of the State of Mississippi as a director of Pediatric Anesthesia Services and Assistant Professor

of Anesthesiology at UMMC. His duties included instructing medical students, residents, and fellows, and treating patients at UMMC and its affiliated sites. In addition, Dr. Scharf was employed by University Anesthesia Services. UAS is one of thirteen departmental practice plans at UMMC. UMMC physicians are contractually required to be part of their department's plan as approved by the Board of Trustees. When the Mozingos filed suit against Dr. Scharf and UAS, they claimed that Dr. Scharf was acting as an independent contractor, not an employee of the state, and that UAS was a private entity, not a governmental entity. Both parties filed motions for summary judgment. The trial court held that Dr. Scharf was a public employee and was therefore subject to MTCA immunity, that UAS was a governmental entity, and that UAS waived its immunity only to the extent of the liability insurance coverage it carried for itself. The trial court entered a final judgment in Dr. Scharf's favor pursuant to M.R.C.P. 54(b).

¶4. Aggrieved by the judgment of the trial court, the Mozingos raise the following issues on appeal:

**I. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE ANESTHESIOLOGIST WAS NOT AN INDEPENDENT CONTRACTOR, BUT RATHER A PUBLIC EMPLOYEE AND THEREFORE ENTITLED TO IMMUNITY UNDER THE MISSISSIPPI TORT CLAIMS ACT?**

**II. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE PRACTICE PLAN, UNIVERSITY ANESTHESIA SERVICES, PLLC, WAS A GOVERNMENTAL ENTITY SUCH THAT IT WAS SUBJECT TO IMMUNITY UNDER THE MISSISSIPPI TORT CLAIMS ACT?**

**III. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE ANESTHESIOLOGIST DID NOT WAIVE HIS IMMUNITY UNDER THE ACT BY PURCHASING MALPRACTICE INSURANCE?**

## DISCUSSION

¶5. This Court's standard of review of a trial court's grant of a summary judgment motion is de novo. ***Aetna Cas. & Sur. Co. v. Berry***, 669 So. 2d 57, 70 (Miss. 1996). There must exist no genuine issues of material fact, and the moving party must be entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c). The burden of demonstrating that there is no genuine issue of material fact falls on the party requesting the summary judgment. ***Short v. Columbus Rubber & Gasket Co.***, 535 So. 2d 61, 63-64 (Miss. 1988). If any genuine triable issues of fact exist, the trial court's grant of summary judgment will be reversed; otherwise the decision will be affirmed. ***Brown v. Credit Ctr., Inc.***, 444 So. 2d 358, 362 (Miss. 1983).

## I.

¶6. The first issue raised on appeal is whether the trial court erred in determining that Dr. Scharf was a state employee, rather than an independent contractor, and as such, was entitled to immunity under the MTCA. Because Dr. Scharf was hired by the UMMC, he claims to be a public employee as defined by the MTCA. Dr. Scharf was additionally employed through UAS, one of the thirteen departmental practice plans established at UMMC. Because Dr. Scharf worked for UAS, the Mozingos allege that Dr. Scharf was engaged in private practice, was therefore an independent contractor, and thus not immune from tort liability.

¶7. The predominant question that arises is, "Was this doctor a state employee working for a public hospital

or was he an independent contractor working in a private medical practice?" If he is determined to be an independent contractor, he is not shielded from liability under the MTCA and this case will be remanded. However, if he is determined to be a state employee, immunity attaches, the doctor is shielded from liability, and this case will be affirmed. This Court has recently decided several cases precisely concerning this issue. They remain fresh in the Court's mind and should be revisited to determine the outcome in this case.

¶8. In *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000), this Court examined a case involving a UMMC doctor who was sued for medical malpractice. *Id*. at 303. The doctor, like Dr. Scharf in the present case, claimed he was immune under the MTCA, and the plaintiff claimed the doctor was engaged in private practice as an independent contractor. *Id*. at 304. The Court reversed the case because more fact-finding was needed to determine whether the doctor's work activities were for UMMC, or whether they were for his own private practice. *Id*. at 310. The most important aspect of the case was this Court's initiation of a five-part test to determine when a doctor is considered an independent contractor or a state employee for the purposes of the MTCA.

¶9. The Court concluded that these five factors must be weighed in order to determine liability under the MTCA:

> 1. the nature and function performed by the employee;
>
> 2. the extent of the state's interest and involvement in the function;
>
> 3. the degree of control and direction exercised by the state over the employee;
>
> 4. whether the act complained of involved the use of judgment and discretion; and,
>
> 5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered. *Id*.

The Court in *Miller* determined that a full application of the five factors would not be possible because the Court needed more information about the doctor's job duties, and therefore established the *Miller* test to be used in future cases. *Id*.

¶10. In *Sullivan v. Washington*, 768 So. 2d 881 (Miss. 2000), the Court concluded that sufficient facts were present in the record enabling the Court to employ the five *Miller* factors and concluded that the two doctors involved, Dr. Meeks and Dr. Sullivan, were immune from tort liability because they were found to be employees of UMMC. *Id*. The Court looked to the first factor of the *Miller* test and determined that Dr. Meeks's function was that of a supervisor. *Id*. at 884. He admitted the plaintiff and attended her surgery, but merely served a public function by providing care to the plaintiff, who was a Medicaid recipient. *Id*. at 884-85. Regarding Dr. Sullivan, the Court determined that his function as an intern was one of continued education and that he too had no private patient relationship with the plaintiff. *Id*. at 885.

¶11. Regarding the second factor, the Court determined that the state had a keen interest in doctors and interns such as Meeks and Sullivan at UMMC. *Id*. Because UMMC is a teaching and learning hospital, the state has an interest to make sure that the State of Mississippi has a ready pool of competent physicians and through his supervision, Dr. Meeks was helping prepare Dr. Sullivan to become a competent physician. *Id*. Regarding the third factor, the Court determined that UMMC exercised control over Dr. Sullivan by requiring him to complete his residency requirements through operations and caring for patients like the

plaintiff, having little decision-making ability over the course of the plaintiff's treatment, and UMMC exercised control over Dr. Meeks by requiring him to supervise Dr. Sullivan. *Id*. Both doctors were controlled by the hospital because neither man chose the plaintiff as their patient. The plaintiff was scheduled and chosen for them. *Id*.

¶12. Regarding factor four, the Court determined that both doctors had little discretion and control over the plaintiff. *Id*. While Dr. Meeks had very little discretion over the plaintiff, the Court found that Dr. Sullivan exercised an amount of discretion in his treatment and diagnosis of the plaintiff. *Id*. The Court recognized that virtually every aspect performed by a person involves the exercise of some discretion and that a professional retains an amount of discretion in practicing his profession. *Id*. In factor five, the Court concluded that the plaintiff in the case was a Medicaid recipient from whom neither Dr. Meeks nor Dr. Sullivan received direct remuneration. *Id*. After discussing and weighing all five *Miller* factors, the Court determined that the two doctors were employees of UMMC for purposes of liability under the MTCA. *Id*. at 886.

¶13. In *Smith v. Braden*, 765 So. 2d 546 (Miss. 2000), the Court, like in *Miller*, determined that more fact finding was needed to determine whether the doctor was an employee of the State of Mississippi; and therefore, it reversed the summary judgment ruling of the trial court. The Court found that Dr. Braden was employed with UMMC as an Assistant Professor of Pediatrics at the School of Medicine and Attending Physician at University Hospital. *Id*. at 550. The Court also determined that Dr. Braden received State employee health insurance, that he was eligible for State employee retirement benefits, that his malpractice insurance was discounted based on his employment with UMMC, and that he could admit patients to UMMC only. *Id*. Additionally, UMMC's provision of his staff and office space further pointed to a strict employment relationship with the hospital.

¶14. However, facts which did not demonstrate a strict employment relationship with the hospital were evidenced by Dr. Braden's sole responsibility to bill and collect income from his treatment of patients. *Id*. at 551. Another fact that led to an unclear employment relationship involved Dr. Braden's partnership with the other pediatric cardiologists in his department. *Id*. The partnership agreement specified, among other things, that compensation derived from "private practice" would be used to pay each doctor and to provide equipment for the partnership. *Id*. The agreement also contained a non-competition clause. *Id*. Furthermore, the partnership agreement repeatedly referred to the partnership as being a "private practice," and the agreement contained no reference to the payment of any amount exceeding an income of $140,000. *Id*. at 552. Also, the Court found that Dr. Braden's income from the partnership was not reported on his UMMC W-2 form, rather he paid self-employment tax on the income he received from the partnership. *Id*. Also, in Dr. Braden's medical insurance application, he declared that he intended to practice at both Woman's Hospital and Methodist Medical Center where he was serving as a consultant. *Id*. at 553. The Court concluded that Dr. Braden's employment status had not been fully fleshed out, that there existed conflicting evidence about his employment status, that questions of fact remained, and therefore, the trial court's grant of summary judgment was premature. *Id*. *Smith v. Braden* is distinct from the present case in that Dr. Scharf did not pay any self-employment tax and received W-2 forms from both UAS and UMMC. Dr. Scharf's taxes were deducted from each paycheck. Additionally, half of any money made over $140,000, was given back to UMMC. This amount is referred to as the "Dean's Tax."

¶15. As in *Sullivan*, this Court concludes that sufficient facts are in this record to enable the Court to apply the *Miller* factors and determine whether the trial court was correct in awarding summary judgment in favor

of Dr. Scharf and UAS. Examining the first factor, the nature of the function performed by Dr. Scharf was clearly a public function. In providing care to Mozingo, Dr. Scharf was fulfilling the requirements of his contract with UMMC. He was treating Mozingo, a patient with whom he had no prior relationship and who was assigned to him for treatment. Furthermore, he was acting as teacher to Dr. Alexander, a medical resident. Dr. Scharf's roles as treating physician and instructor are mandated by Dr. Scharf's employment with UMMC. Furthermore, Mozingo was a Medicaid patient. As noted in *Sullivan*, the operational purpose of UMMC is to treat a significant number of Medicaid patients. *Sullivan*, 768 So. 2d at 886 (citing Miss. Code Ann. § 37-115-31(2001)).

¶16. In examining the second factor - the extent of the state's interest and involvement in the function - it is clear that the State of Mississippi has a keen interest in cases of this nature. UMMC's operational purpose under Miss. Code Ann. § 37-115-31 is to provide care to the indigent and persons on Medicaid. By providing anesthesia services to Mozingo, a Medicaid patient, Dr. Scharf was carrying out this operational purpose. Additionally, UMMC was established as a teaching hospital. Miss. Code Ann. § 37-115-25(2001). Dr. Scharf was engaged in training a resident while he was providing anesthesia services to Mozingo. It would be impossible to fully equip a new doctor with the tools he or she needs to practice medicine without actually engaging in the hands-on practice of providing care to patients. That is indeed what Dr. Scharf was doing on March 27, 1997, when he was showing Dr. Alexander how to administer anesthesia to Mozingo.

¶17. Regarding the third *Miller* factor -- the degree of control and direction exercised by the state over the employee -- Dr. Scharf was assigned to provide care to Mozingo on March 27, 1997, and was not allowed to refuse this assignment made by his employer, UMMC. Dr. Scharf also had no right to choose or limit the doctors with whom he worked. He was specifically required through his employment contract with UMMC to associate through UAS. Because participation in their respective practice groups does not change their status as UMMC employees, physicians such as Dr. Scharf remain subject to all UMMC policies and procedures. UAS, like other departmental practice plans, is under the management and control of the departmental chairman. The departmental chairman provides day-to-day oversight of the practice group, and UAS is subject to limited oversight by UMMC's Vice Chancellor for Health Affairs and UMMC's Associate Vice Chancellor for Administrative Affairs.

¶18. Without question, the fourth *Miller* factor - whether the act complained of involved the use of judgment and discretion - is met in cases such as this. In *Sullivan*, this Court recognized that physicians exercise an amount of judgment and discretion in treating, diagnosing, and observing their patients. 768 So.2d at 885. Likewise, it cannot be doubted that Dr. Scharf used some discretion in treating and observing Mozingo. However, this Court stated in *Sullivan* as it does today, that these acts of discretion are considerations, but are not determinative acts. *Id*. As stated in *Sullivan*, "Virtually every act performed by an individual involves the exercise of some discretion. Obviously, a professional retains a significant amount of discretion in the operation of his profession." *Id*. In fact, "[t]he Hippocratic Oath requires that the physician ' . . . use [his] power to help the sick to the best of [his] ability and judgment.'" *Id.*

¶19. The final factor is whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered. Like the plaintiff in *Sullivan*, Mozingo was a Medicaid patient from whom Dr. Scharf received no direct remuneration. As in *Sullivan*, UAS handles the billing and collection for Dr. Scharf's services, and Dr. Scharf does not collect directly from his patients. Any remuneration to Dr. Scharf by way of his group's collection was, at most, indirect. *See id.* at 885-86. As

such, this fifth factor does not weigh in the Mozingos' favor.

¶20. Again, Dr. Scharf was required by his contract with UMMC to practice through UAS. The contract specifically acknowledged the fact that Dr. Scharf would be earning compensation through UAS. However, not all sums so earned were retained by Dr. Scharf. Dr. Scharf's employment contract with UMMC required Dr. Scharf to return to UMMC 50% of his earnings over $140,000 threshold amount.

¶21. In weighing all five *Miller* factors and applying them to the case at bar, it is clear that they weigh strongly in Dr. Scharf's favor. Dr. Scharf was employed by UMMC and was required to participate in his department's practice plan, UAS. In his capacity as an anesthesiologist and employee of UMMC, Dr. Scharf was required to administer anesthesia to Mozingo on March 27, 1997. He performed a dual role that day by providing anesthesia services to Mozingo, a Medicaid patient, and by providing instruction to a medical resident who was present for the surgery. The state has a keen interest in both roles performed by Dr. Scharf. Certainly, Dr. Scharf's actions involved discretion and judgment, but this factor is not solely determinative of Dr. Scharf's employment status. Finally, Mozingo did not pay Dr. Scharf directly for services rendered. Dr. Scharf was permitted to earn income through UAS in addition to his base salary paid by UMMC. However, his income through UAS was limited by his contract with UMMC, and he was required to return to UMMC a portion of that income. Because Dr. Scharf was an employee of UMMC and therefore a state employee, the trial court did not err when it determined that MTCA applied to Dr. Scharf. Because he is an employee of UMMC, he is therefore immune from liability.

## II.

¶22. The second issue is whether the trial court erred in determining that the practice plan, University Anesthesia Services, PLLC, was a governmental entity such that it was subject to immunity under the Mississippi Tort Claims Act. The trial court found that UAS was a governmental entity and as such it did not destroy Dr. Scharf's immunity through the MTCA.

¶23. Medical practice plans are organized groups of physicians with medical school faculty appointments who, in addition to research and medical education responsibilities, provide patient care services to both insured and uninsured patients. Most of the medical practice plans utilize UMMC departmental personnel within their respective departments to perform work on behalf of the medical practice plans. On February 20, 1995, the Commissioner of the Institutions of Higher Learning wrote a letter to the Vice Chancellor for Health Affairs at UMMC, approving the implementation of a revised practice plan at UMMC. The practice plan included requirements to provide consistency between the running of each department of the hospital.

¶24. Regarding practice plans and the status of physicians in them, an opinion was published by the Attorney General of Mississippi, Miss. Att'y Gen. Op. No. 98-0500, 1998 WL 703775 (Sept. 4, 1998), in which the Attorney General stated:

> Faculty of the University of Mississippi Medical Center, sometimes referred to as staff physicians enter into a contract for their services and receive payment therefor from the University of Mississippi Medical Center, an agency or arm of the State of Mississippi. In addition, they are required to participate in a faculty practice plan pursuant to their employment contract with the Board of Trustees. The practice plans as approved by the Board of Trustees since 1955, provide additional income for faculty physicians, a portion of which is payable to UMMC. Based on the facts stated . . . , it is our opinion that staff physicians under contract with the University of Mississippi Medical Center are

employees of a governmental entity of the State of Mississippi, and the Medical Center is responsible for affording them a defense and paying any judgment against them or settlement for any claim arising out of an act or omission within the course and scope of their employment, and within the limits of the Mississippi Tort Claims Act.

¶25. University Anesthesia Services, PLLC, was created on July 1, 1995. Each department at UMMC, with the exception of the Ophthalmology Department, has established a formal medical practice plan. The trial court found that UAS was a governmental entity within the definitions of both "political subdivision" and "state." Miss. Code Ann. § 11-46-1 (i) & (j). "A 'political subdivision' means any body politic or body corporate . . . responsible for governmental activities." *Id.* § 11-46-1(i). The Mozingos argue that UAS is not a governmental entity in that UAS does not carry out any governmental activities and that UAS's sole function is to provide private medical services to patients at UMMC. However, providing patients with medical services is a statutorily established activity that UMMC has been mandated to provide by the Mississippi Legislature. UMMC is to provide "clinical and outpatient services and all types of services deemed to be necessary or desirable as a part of the functioning of such teaching hospital." Miss. Code Ann. § 37-115-25 (2001). At least half of these services are required to go to indigent persons or Medicaid recipients. *Id.* § 37-115-27. By providing clinical patient services, UAS is carrying out state governmental activities on behalf of UMMC. Therefore, UAS falls squarely within the definition of a political subdivision.

¶26. The trial court also found that UAS fell within the definition of "state." "State" means the State of Mississippi and any office, department, agency, division, bureau, commission, board, institution, hospital, college, university, airport authority, or any other instrumentality thereof . . . ." Miss. Code Ann. § 11-46-1(j). UAS falls within the definition of "state" because it is an instrumentality of UMMC. An instrumentality is not specifically defined in the above code section, however, the Legislature was using "instrumentality" as an inclusive term so as not to limit the means by which the state could carry out its governmental functions. While other terms in the above code section would apply to UAS ( i.e., department, office, division), "instrumentality" seems to be the most appropriate term to describe UAS.

¶27. UAS was created to provide anesthesia services to patients at UMMC. As already noted, UMMC is a teaching hospital which functions to carry out the goal of the Legislature - to provide low cost or no cost health services to indigent persons or persons on Medicaid who live in the state. UAS is also staffed with UMMC faculty members who provide another important function to the State of Mississippi - to prepare future physicians to practice in the State. Furthermore, UAS is bound by UMMC guidelines. Actions with regard to physicians at UMMC are limited by the rights of the physicians as state employees at UMMC. UMMC has numerous divisions and practice plans under its umbrella consisting of numerous organized groups of physicians with medical school faculty appointments. Twelve of these clinical departments, including the Department of Anesthesiology, formed the plan at issue here. However, these physicians cannot moonlight on other jobs in private practice, but rather are limited to providing services at UMMC. In fact, every doctor providing clinical patient services at UMMC is required by the state to belong to the practice plan. Practically every case this Court has considered regarding the subject matter of immunity under the MTCA has involved one or more physician who is both a member of a practice plan and UMMC as required. Thus, UAS was created because of a direct edict from the state agency charged with the management of UMMC. We find that UAS was simply an entity created to facilitate the billing and collection of physician fees generated by state employees. It is not a private entity. The trial court did not err when it concluded that UAS was indeed a governmental entity and as such, the trial court is affirmed on this

issue.

## III.

¶28. The third issue is whether the trial court erred in determining that Dr. Scharf did not waive his immunity under the MTCA by purchasing malpractice insurance. Dr. Scharf was covered under a professional liability policy personally issued to him at the time of the incident. The policy was purchased by UAS on behalf of Dr. Scharf, and Dr. Scharf personally purchased additional coverage on the same policy.

¶29. By having liability insurance, Dr. Scharf has not waived his immunity under the MTCA. We held in ***Knight v. McKee***, 781 So. 2d 121 (Miss. 2001), that a physician who treats a patient in his capacity as an employee of UMMC does not waive his immunity by possessing professional liability insurance. Likewise, the fact that Dr. Scharf possessed liability insurance is irrelevant to the inquiry as to whether he enjoys immunity under the MTCA. *See also* Miss. Att'y Gen. Op. No. 96-0053, 1996 WL 88865 (Feb. 16, 1996) (stating that governmental employee's personal policy is not subject to exposure for injuries resulting from torts committed during the course and scope of employment).

¶30. Miss. Code Ann. § 11-46-17(4) has been interpreted by this Court as providing that only the governmental entity, not the employee, may be sued to the extent of its insurance coverage. ***Maxwell v. Jackson County***, 768 So. 2d 900, 902-03 (Miss. 2000); ***Leslie v. City of Biloxi***, 758 So.2d 430, 433-34 (Miss. 2000). The MTCA contains no provision allowing for the waiver of a state employee's immunity because of the existence of liability insurance. The trial court did not err when it held that only a governmental entity, not an employee such as Dr. Scharf, may be sued to the extent of its coverage under the MTCA.

## <u>CONCLUSION</u>

¶31. Dr. Scharf did not lose his status as an employee with the state of Mississippi when he signed his employment contract with UMMC on July 1, 1996, and was subsequently required to participate in UAS, a departmental practice plan approved by the State Institutions of Higher Learning. While performing services for T.J. Mozingo on March 27, 1997, Dr. Scharf was engaged in a dual role - that of a professor and that of a physician. He was providing anesthesia services to Mozingo while at the same time instructing a medical resident on how to administer anesthesia to a patient. He was functioning at the behest of the state by carrying out the state's functions of providing care to this Medicaid recipient and instructing future practitioners of the state. The trial court did not err when it determined that Dr. Scharf was a state employee and therefore entitled to immunity under the MTCA.

¶32. Additionally, regarding UAS, it was a departmental practice plan implemented by the Anesthesia Department at UMMC and as such was an instrumentality of UMMC. As evidenced by the Attorney General's opinion, practice plans are governmental entities of the State of Mississippi. UAS is a governmental entity that squarely meets the statutory definitions of "political subdivision" and "state." The trial court did not err when it determined that UAS was a state governmental entity.

¶33. Furthermore, the trial court correctly held that Dr. Scharf did not waive his immunity because he carried malpractice insurance. UAS has a liability policy providing $3,000,000 in coverage. Its immunity may have been waived to that extent, but not Dr. Scharf's. Case law and statutes are clear on that point. The MTCA precludes personal liability by the individual employee, and the existence of a personal

insurance policy is not relevant.

¶34. For the foregoing reasons, this Court affirms the judgment of the trial court.

¶35. **AFFIRMED.**

**PITTMAN, C.J., WALLER, COBB AND CARLSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. McRAE, P.J., AND EASLEY, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**