# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01316-SCT

*BILL WATTS AND BOBBIE WATTS*

*v.*

*BRIAN TSANG, M. D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/04/1998 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | ROBERT L. WELLS |
| ATTORNEYS FOR APPELLEE: | C. ALLEEN McLAIN |
| | GEORGE Q. EVANS |
| | ROBERT G. JENKINS |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 10/17/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, JUSTICE, FOR THE COURT:**

¶1. In May 1995, Bill Watts underwent a surgical procedure at the University of Mississippi Medical Center (UMMC) that rendered him a paraplegic. Watts and his wife Bonnie filed a complaint alleging negligence against Dr. Brian Tsang and others, in the Hinds County Circuit Court, First Judicial District. In the complaint, Watts alleged that Dr. Tsang was an employee of UMMC and was acting on its behalf. The circuit court later allowed Watts to amend his complaint, to no longer claim that Dr. Tsang was an employee of UMMC, but instead, to claim that he was an employee of University Anesthesia Services, PLLC, (UAS), and acting for his own personal pecuniary interest.

¶2. After approximately two years of discovery and other pre-trial proceedings, Dr. Tsang filed a motion for summary judgment claiming immunity under the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. §§ 11-46-1 to -23 (2002). In August 1998, the circuit court granted summary judgment in favor of Dr. Tsang and certified that judgment as final under M.R.C.P. 54(b), and aggrieved, Watts appealed.

¶3. Subsequent to the parties' filing their briefs on appeal, this Court decided *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000). Both Watts and Dr. Tsang supplemented their briefs, pursuant to M.R.A.P. 28(j). Although both continued to rely on authority previously set out in their briefs, they also took the opportunity to apply the new test articulated in *Miller* to the facts of this case. After doing so, both parties concluded that their side should still win. Watts further took this opportunity to add an additional argument, in the alternative, that, due to our decision in *Miller*, this case must be reversed and remanded to the circuit court because there existed a genuine issue of material fact making summary judgment improper.

¶4. Watts's assignments of error, edited for brevity, are:

**I. WAS DR. TSANG IMMUNE UNDER THE MTCA?**

**II. DID THE INSURANCE POLICY WAIVE IMMUNITY TO THE EXTENT OF COVERAGE?**

**III. APPLYING THE *MILLER* TEST, WAS THERE AN ISSUE OF MATERIAL FACT?**

¶5. Concluding that UAS is an instrumentality of the State and that Dr. Tsang was at all times acting as a state employee, we affirm the circuit court's grant of summary judgment.

## FACTS

¶6. Bill Watts visited the UMMC emergency room suffering from severe back pain and other maladies. He was later admitted to the hospital for further medical treatment. Watts's primary physician contacted Dr. Tsang, director of UMMC's Pain Clinic, because he was unable to arrest Watts's acute pain. In order to relieve the suffering a "selective nerve root block" procedure was attempted. Dr. Brian Tsang supervised Dr. Stephen Long, who actually performed the procedure. They had attempted to perform the procedure on May 18, but even under high doses of narcotics, Watts was in such severe pain he could not hold still long enough for them to do so. They tried again the next day. Due to the level of pain Watts was experiencing, Dr. Tsang decided it would be best to put a local anesthetic around the affected nerve in Watts's spine and to have Dr. Long perform the procedure while Watts was under general anesthesia. The procedure did not go as planned, and Watts was left a paraplegic.

¶7. Dr. Long was a fellow in training in the pain management program at UMMC. He had completed his residency in anesthesiology and was training for an additional year as a fellow in pain management. Prior to performing the procedure, Dr. Tsang discussed the nerve block with Dr. Long, both from a book and through a skeletal model in the anesthesia library. During the procedure, Dr. Tsang was there to teach, observe and be sure the procedure was followed correctly. There is no indication in the record that Dr. Long is still a party defendant, but neither is there anything to indicate he has been dismissed. (As will be discussed further in Issue III, resident physicians have been held, as a matter of law, immune under the MTCA.)

¶8. Dr. Tsang was employed as an assistant professor of anesthesiology in the School of Medicine at UMMC. He had completed his education at Yale University, then a pain fellowship at Stanford University. After that he became part of the pain clinic at the University of California at Davis. He was certified in pain management by the American Board of Anesthesiologists. In 1995, Dr. Tsang was recruited from the West Coast to become the director of the Pain Clinic at UMMC.

¶9. Under oath, Dr. Tsang avers that at no time during his employment with the Board of Trustees of State Institutions of Higher Learning (the Board of Trustees) has he performed any private practice outside of UMMC. His duties as a professor include instruction of medical students, residents, and fellows; treatment of patients at UMMC and affiliated sites; and other duties as assigned by his superiors. He claims that all treatment he provided to Watts was done at UMMC, and that at all times he was in the course and scope of his employment with the Board of Trustees. Further, Donald Seagrove, the Director of Human Resources for UMMC, testified under oath that all treatment provided by Dr. Tsang to Watts was within

the course and scope of Dr. Tsang's duties as a UMMC professor.

¶10. Medicare was billed for the treatment received by Watts. A portion of that money was paid to University Anesthesia Services (UAS), a UMMC medical practice group. UAS bills and collects for services performed by students, residents, interns and fellows who are supervised by the anesthesiology faculty at UMMC while performing procedures at UMMC. All of UAS's revenues are generated through treating patients at UMMC. All faculty members of the Department of Anesthesia must belong to UAS, and the income generated by UAS, inter alia, supplements the base salaries of these faculty members. However, the money generated in this fashion is not paid directly from UAS to the faculty member. Instead, UAS uses an elaborate point system whereby the department's faculty-physicians receive points for performing tasks such as teaching, making presentations, and conducting research. Dr. John Eichhorn, Chairman of the Department of Anesthesia at UMMC, at his deposition, explained how this point system works:

> There are two fundamental parts. The first part is a monthly base, if you like, or just - - it's a monthly compensation paid on the 15th that was discussed before his arrival, and then the second part which is more - - certainly more complex - - I was going to say interesting - - is what we call quarterly distribution based on a rather complex point system which includes a small element as far as clinical service is concerned, but especially in the case of Dr. Tsang. He gets a significant number of points in that system for, for example, submitting an abstract to a national meeting, or he gets even more points for submitting a journal article to a scientific journal. He gets points for a grant application which is relevant since he just got a research grant. And it's through these acknowledgments of academic activity, such as publications, abstracts, papers, research grants, research activity, and even lectures - - I mean, for his lecture to the medical students, okay, he got a significant number - - not a huge number, but he got an appreciable number of points for giving that lecture to the second-year medical students that led to compensation - - dollars flowing from University Anesthesia Services to him because of his academic activities. In his case it would be research that would be by far the largest component and very significant. He is far and away number one in the department as far as getting compensation for his research activities.

¶11. Thus, while UAS did bill and collect reimbursement from Watts's Medicare insurance for the medical services provided by the anesthesiology department of UMMC, Dr. Tsang's compensation was not affected by whether $0, $10 or $10,000 was collected from Watts. In fact, pursuant to the point system employed by UAS, Dr. Tsang would be compensated for a procedure he supervised whether or not the patient were a private patient, a government paid patient (Medicare/Medicaid), or a charity patient who pays nothing at all. In a letter dated December 6, 1994, from Dr. John Eichhorn to Dr. Tsang confirming the UMMC faculty position offered to him, it states the following:

> **Our current system of compensation from the UAS practice** (while unlikely, always subject to possible revision based on faculty input) is a monthly "guarantee" check (on the 15th) and a quarterly "productivity compensation" check (about two weeks after the end of each calender quarter), the details of which for both we discussed extensively.

(emphasis added). Dr. Tsang's employment contract with the Board of Trustees states the following:

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER CODE: UMMC - 2

(ADDITIONAL INCOME/PRO RATA SHARE OF EXPENSES)

1. In accordance with **policies approved by the Board**, the Employee, in addition to his/her annual contracted salary, will be permitted to earn additional income from medical practice subject to the following limitations:

a) The Employee shall retain 100% of earnings from medical practice up to a total income of $ _____ , effective July 1, 1992.

b) Income in excess of $ _____ will be divided 50% to the employee and 50% to the University of Mississippi Medical Center (UMMC). Of the amount allocated to the Medical Center, 60% shall be for the use of the department of the employee.

Income shall be defined as gross calendar year earnings from UMMC and the Department of Veterans Affairs Medical Center up to $ _____ plus medical practice earnings.

(emphasis added).

¶12. Although the actual base salary of Dr. Tsang is not revealed in the record, during the 1998-1999 academic year the base salary for an assistant professor at UMMC was $64,000. According to the a report from the Association of American Medical Colleges, the nationwide average compensation for an assistant professor of anesthesiology is $161,200. UMMC's medical practice plans are used to bridge this salary gap, thus making it possible to hire and retain highly skilled physicians to teach. The record does not reveal how much of Dr. Tsang's total compensation was supplemented by the medical practice fees distributed by UAS.

¶13. Originally UAS was a partnership, whose membership consisted of the faculty of the UMMC anesthesia department. This partnership was later converted into a professional limited liability corporation with Dr. Eichhorn, the department chair, owning 95% of the shares and a Dr. Strong owning 5%. Dr. Eichhorn admits that no State entity has any financial ownership in UAS. However, this is illusory because he, as the department chair, serves at the pleasure of the chancellor of the medical school. Further, pursuant to UAS's charter, if Dr. Eichhorn were removed from his position as department chair, UAS would cease to exist, and the new department chair would be required to incorporate a new practice group.

¶14. Even though the original partnership agreement for UAS says: "WHEREAS, the Members desire to form a partnership for the purpose of providing anesthesia services **in the private practice of medicine at the University Hospital**" (emphasis added), Dr. Tsang and others similarly situated clearly were not involved in the "private" practice of medicine. As Dr. Eichhorn's testimony indicates, UAS exists at the direction of the Board of Trustees and is composed of only UMMC faculty members. Dr. Eichhorn further testified that membership in UAS was provided for in the Board's contract with Dr. Tsang, and is clearly part and parcel of the employment system at UMMC. Further, Dr. Tsang was prohibited from practicing anywhere else except UMMC and affiliated institutions, and "the Board controlled the entire professional life of Tsang as teacher, administrator, researcher, and practitioner as its employee and it also controlled UAS's existence."

¶15. The circuit court's opinion and order granting summary judgment states:

The undisputed evidence establishes that Dr. Tsang was an employee of the State through the Board of Trustees of the State Institutions of Higher Learning and subject to the protection of the Tort

Claims Act. As this Court has found in previous cases, in construing similar issues, staff physicians under contract with the Board of Trustees of the State Institutions of Higher Learning are expected to teach medical students, conduct research and provide patient care. In exercising these responsibilities, as Dr. Tsang was during the treatment of Mr. Watts, he did so as a state employee in the course and scope of his employment. Dr. Tsang's simultaneous employment with University Anesthesia Services, PLLC provides a method for additional compensation as authorized and directed by his contract with the Board of Trustees of the State Institutions of Higher Learning. Further, any compensation from University Anesthesia Services, PLLC is subject to Dr. Tsang's contract with the Board of Trustees of the State Institutions of Higher Learning, which requires that over a certain amount, Dr. Tsang must return fifty percent of his compensation to the University of Mississippi Medical Center.

## STANDARD OF REVIEW

¶16. "A grant of summary judgment is reviewed de novo. The evidence is viewed in the light most favorable to the non-moving party. If any triable issues of fact exist, the trial court's grant of a summary judgment will be reversed; otherwise the decision will be affirmed." *Conley v. Warren*, 797 So.2d 881, 882 (Miss. 2001)(citations omitted).

## DISCUSSION

### I. WAS DR. TSANG IMMUNE UNDER THE MTCA?

¶17. The MTCA "provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to a suit." *L.W. v. McComb Separate Mun. Sch. Dist.*, 754 So.2d 1136, 1138 (Miss. 1999); *see* Miss. Code Ann. § 11-46-7(1)(2002). "Any tort claim filed against a government entity or its employee shall be brought only under the MTCA." *L.W.,* 754 So. 2d at 1138. "The MTCA waives sovereign immunity from claims for money damages arising out of the torts of governmental entities and their employees." *Id.* Moreover, "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." Miss. Code Ann. § 11-46-7(2).

¶18. The MTCA makes the State responsible for the negligence of its employees at a financial level the Legislature has determined to be reasonable. Watts has been fully compensated by the State of Mississippi according to this program. Watts claims he is entitled to more money from Dr. Tsang because Dr. Tsang was not an employee of the State at the time of the alleged negligence, but was instead an independent contractor employed by UAS. This employee/independent contractor distinction is critical because, as an employee he would enjoy the immunity afforded by the MTCA in his individual capacity, but as an independent contractor, he would not. Pursuant to the MTCA, in its definition section, an employee is defined as follows:

(f) "Employee" means any officer, employee or servant of the State of Mississippi or a political subdivision of the state, including elected or appointed officials and persons acting on behalf of the state or a political subdivision in any official capacity, temporarily or permanently, in the service of the state or a political subdivision whether with or without compensation. The term **"employee" shall not mean a person or other legal entity while acting in the capacity of an independent contractor** under contract to the state or a political subdivision;

Miss. Code Ann. § 11-46-1(f). In interpreting this statute, this Court has found the mandate of this

subsection unambiguous, stating: "Immunity is extended to any state employee who is not acting as an independent contractor." *Miller v. Meeks*, 762 So. 2d at 305.

### A. The Correctness of the Trial Court's Decision

¶19. At the heart of Watts's argument is that UAS is a private, for-profit corporation, not an instrumentality of the State, and thus while working for UAS, Dr. Tsang was an independent contractor and not a State employee. In order to resolve this issue, the status of UAS must be determined. Watts's characterization of UAS as simply a private corporation created for the personal profit of physicians is incorrect and totally misleading.

¶20. This Court has not yet affirmatively decided whether receiving income from UMMC's medical practice plans makes the faculty-physician an independent contractor. However, the Mississippi Attorney General's Office and the United States District Court for the Southern District of Mississippi both have. They agree that UAS is an instrumentality of the State and that its faculty-physicians under contract with UMMC are employees of a governmental entity.

### 1. The Mississippi Attorney General's Opinion

¶21. Vice Chancellor Conerly of UMMC requested a formal opinion from the Attorney General to confirm UMMC's conclusion (or instruct it otherwise in the matter) that the faculty-physicians who are participating in UMMC's medical practice plans are employees of the State. The Attorney General responded as follows:

> staff physicians under contract with the University of Mississippi Medical Center are employees of a governmental entity of the State of Mississippi, and the Medical Center is responsible for affording them a defense and paying any judgment against them or settlement for any claim arising out of an act or omission within the course and scope of their employment, and within the limits of the Mississippi Tort Claims Act.

Conerly, September 4, 1998, Miss. A.G. Op. #98-0500 (1998 WL 703775).

### 2. The United States District Court for the Southern District of Mississippi

¶22. In *Kight & Butler v. United States*, No. 3:98CV644WS (S.D. Miss. Sept. 30, 1999), the district court reached a similar conclusion, in a wrongful-death suit brought by the natural parents of two children who died from Rocky Mountain spotted fever against Dr. Sandor Feldman and others. Dr. Feldman was a faculty-physician with UMMC who belonged to its University Pediatric Associates medical practice plan. The district court considered both the actual terms of Dr. Feldman's contract with UMMC and his conduct in treating patients. The district court concluded that Dr. Feldman was a State employee under the MTCA, immune from suit in his personal capacity, and granted summary judgment in favor of Dr. Feldman. The district court went on to state:

> Whether teaching or consulting on UMC [UMMC] patients, Dr. Feldman was performing services which were part of UMC's regular business and he was subject to the right of control by UMC and/or the Board. Dr. Feldman also received numerous employee benefits for which he would not have been eligible had he been an independent contractor: health, life and disability insurance, tax sheltered annuities, cafeteria plan, state employees' retirement plan, and accrual of vacation and sick

time as provided by law for state employees.

*Id.* at 2.

¶23. Given the sufficient information in the record before this Court concerning details of the UMMC departmental practice plans in general, and the UAS plan specifically, from which to determine that receiving income from a UMMC medical practice plan does not make a physician an independent contractor, we today so hold.

¶24. It should be remembered that the MTCA is a legislative, not judicial creation. "[T]he function of creating a public policy is primarily one to be exercised by the Legislature and not by the courts." *Miss. Baptist Hosp. v. Holmes*, 214 Miss. 906, 931, 55 So.2d 142, 152 (1951). Moreover, because the Legislature "controls the purse," it is the Legislature that must determine the salaries of the faculty of our state medical school. The Legislature created the state teaching hospital in order to train physicians for this state. The statute mandates that UMMC shall establish "clinical and out patient services and all types of services deemed to be necessary or desirable as a part of the functioning of such a teaching hospital." Miss. Code Ann. § 37-115-25 (2001). UMMC is mandated to take all patients, whether they are able to pay or not. The Board of Trustees, which has authority over this state's teaching hospital, has mandated an employment plan for its faculty which includes a base salary, supplemented by money received at the teaching hospital for clinical and outpatient services. This supplemental income is administered by UMMC's medical practice plans.

¶25. Under the contract Dr. Tsang signed with the State of Mississippi, he must belong to one of these medical practice plans created and administered by the State, and can work only at UMMC. Further, only faculty at UMMC can belong to these medical practice plans.

¶26. Watts's argument that providing medical services to patients at UMMC is a private, as opposed to State, activity is unconvincing. The Mississippi Legislature has statutorily mandated that UMMC provide patients with medical services, with at least half of these services required to go to indigent persons or Medicaid recipients. UAS's existence as a private corporate entity does not negate its status as a political subdivision. Miss. Code Ann. § 11-46-1(i) states, "A 'political subdivision' means any body politic or body corporate . . . responsible for governmental activities." Thus, UAS falls squarely within the definition of a political subdivision because it is responsible for governmental activities.

¶27. Further, UAS is properly considered an instrumentality of the State. "State" is defined as "the State of Mississippi and any office, department, agency, division, bureau, commission, board, institution, **hospital, college**, university, airport authority, **or any other instrumentality thereof** . . .." Miss. Code Ann. § 11-46-1(j) (emphasis added). UAS meets the definition of "State" because it is an instrumentality of UMMC, a state teaching hospital.

¶28. Therefore, UAS is an instrumentality of the State, even though it is a private, for- profit corporation that pays state taxes like other private corporations.

### B. The Background, Nature, and Purpose of the Medical Practice Groups

¶29. Watts's characterization of UAS as a private corporation solely for the benefit of the physicians, so that they can hide behind State immunity in their private practice, is disingenuous. The State created UAS, not primarily for the benefit of the faculty-physicians, but instead, for its own benefit. The State has a

compelling interest in training doctors in this state and caring for indigent patients. The State wants to attract the best instructors for its teaching hospital. Without subsidizing the income of its faculty through these medical practice plans, it can not do so. When the faculty-physician is hired, the compensation arrangement is explained. He or she receives a base salary provided from the State coffers, which is then supplemented by patient care revenues collected at the teaching hospital. The faculty-physicians did not devise this creative salary system, and they have no choice whether or not they want to participate in it. Watts's argument that they have a choice not to participate in one of plans is specious at best. It would be similar to arguing that any employee has a choice whether or not to accept part of, instead of all of his or her salary. Without the money channeled through UAS, Dr. Tsang would not be receiving the full salary and benefits he bargained for as a State employee.

### C. The Holding of This Court

¶30. We find as a matter of law that Dr. Tsang cannot lose his status as a State employee, and the immunity that status affords, merely by receiving a portion of his compensation through UAS. UAS is nothing more than the State's vehicle for providing and billing for patient care at its state hospital and supplementing the income of its faculty-physicians. If Dr. Tsang lost his faculty appointment, he would automatically lose his hospital privileges, and his employment with UAS would automatically terminate.

¶31. That said, we are *not* holding that all medical practice groups are per se instrumentalities of the State. However, where as here the medical practice group was created by UMMC, and is overseen by UMMC, and the purpose is to supplement the income of its faculty; when the day-to-day oversight is left to the department chair, subject to limited oversight by the vice chancellor, and its membership is composed solely of full-time UMMC faculty-physicians; where the faculty-physicians can only practice at UMMC approved sites, and the money is distributed on a point system based on factors other than mere patient service, we must conclude that the medical practice group is a State entity.

¶32. We are also *not* holding that receiving compensation from a medical practice plan makes one an employee of the State. Physicians who engage in private practice, separate from UMMC, cannot acquire State immunity for their private practice by merely doing work at UMMC or receiving payment from one of its medical practice plans.

¶33. In sum, we are deeply saddened by the unfortunate injury suffered by Mr. Watts. However, the waiver of sovereign immunity, and up to what amount, is determined by the Legislature. The MTCA makes the State responsible for the negligence of its employees at a financial level the Legislature has determined to be reasonable. Watts has been fully compensated by the State of Mississippi according to this program. We find as a matter of law that UAS, as it is currently composed and administered, is an instrumentality of the State, and thus its faculty-physician members are not rendered subcontractors merely for receiving part of their contracted for salary from UAS.

### II. DID THE INSURANCE POLICY WAIVE IMMUNITY TO THE EXTENT OF COVERAGE?

¶34. Watts argues that Dr. Tsang was either the employee of a private entity, UAS, and thus had no immunity, or he was an employee of an arm of the State through UAS and thus immunity was waived by the purchase of the liability insurance policy. Since our holding in Issue I has addressed his first contention, we will now address his alternative.

¶35. Dr. Tsang argues that his insurance policy was purchased because of the history of changing developments in immunity afforded by the MTCA as this Court has wrestled with interpreting its provisions. He claims he could not afford to teach medical students, supervise procedures and treat patients without insurance until this Court definitively rules that UMMC faculty-physicians are employees covered by the State's immunity. The case before us proves he was prudent in doing so.

¶36. The Mississippi Legislature created the MTCA and has determined under what circumstances the State waives its sovereign immunity. Pursuant to § 11-46-16 and § 11-46-17, the Legislature has waived the sovereign immunity of the State, up to the limits of liability insurance purchased by the State entity. However, this particular waiver of immunity only concerns the State entity; it does not apply to a state employee in his or her individual capacity. The trial court in its opinion and order held:

> The Court is aware that Dr. Tsang has an insurance policy that was not purchased by the University of Mississippi Medical Center or the Board of Trustees of State Institutions of Higher Learning. However, the Court finds that this insurance does not provide for a waiver of immunity pursuant to Miss. Code Ann. § 11-46-16 (1972, as amended). Section 11-46-16 only waives immunity to the extent of insurance purchased by the governmental entity. Dr. Tsang is an employee as contemplated by the Tort Claims Act. His insurance does not waive any immunity. Furthermore, Miss. Code Ann. § 11-46-7(2) bars suit against individual defendants in their personal capacities.

¶37. After the trial court issued its opinion, this Court decided ***Knight v. McKee***, 781 So.2d 121 (Miss. 2001). In ***Knight***, this Court addressed this very issue, and its holding indicates that the circuit court was right: the purchase of personal medical malpractice insurance by an employee of the State does not waive immunity. In ***Knight***, we said:

> The fact that the two physicians have personally acquired professional liability insurance is irrelevant to the inquiry as to whether a state employee enjoys immunity under the MTCA. In a recent case, ***Maxwell v. Jackson County***, 768 So.2d 900 (Miss. 2000), we held that a county did not waive its immunity protections under the MTCA when it purchased liability insurance in excess of the limits imposed by the MTCA. We now extend this holding to apply to state employees also. Finally, the MTCA contains no provision allowing for the waiver of a state employee's immunity because of the existence of professional liability insurance.
>
> ***Womble***, does not provide authority to revoke the immunity granted to state employees by the MTCA. In ***Barnes v. Singing River Hosp. Sys***., 733 So.2d 199, 206 (Miss. 1999), we refused to extend ***Womble*** to medical malpractice cases against state hospitals. As a natural extension to ***Barnes***, the Court finds that ***Womble*** does not apply to medical malpractice cases against physicians who are employed by state hospitals.

***Knight***, 781 So.2d at 123. Pursuant to the precedent of this Court, purchase of medical malpractice insurance by a faculty-physician at the UMMC does not waive immunity to the extent of coverage. This issue is without merit.

### III. APPLYING THE *MILLER* TEST, WAS THERE AN ISSUE OF MATERIAL FACT?

*A. The Miller Test.*

¶38. In *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000), this Court attempted to resolve a dilemma that has plagued the courts, namely, whether faculty-physicians at UMMC were employees or independent contractors when treating patients at the UMMC. This Court concluded that the previous test this Court employed, from *Richardson v. APAC-Miss. Inc.,* 631 So.2d 143, 150 (Miss. 1994), proved to be quite troublesome in evaluating the relationship between the University and its faculty-physicians. In *Miller* we adopted the following five-part test to be applied in making that determination:

    1. The nature of the function performed by the employee;

    2. The extent of the state's interest and involvement in the function;

    3. The degree of control and direction exercised by the State over the employee;

    4. Whether the act complained of involved the use of judgment and discretion;

    5. Whether the physician receives compensation either directly or indirectly, from the patient for professional services rendered.

*Miller*, 762 So. 2d at 310. In *Miller*, we reversed the grant of summary judgment in favor of the faculty-physician and remanded because there were triable issues of fact. *Id.* at 311. We did not decide whether the faculty-physician was a state employee at the time of the injury, but instead, left that determination for the trial court on remand, applying the newly adopted test. *Id.* In that case, the faculty-physician was not involved in any instruction while treating the patient, and there was no discussion whether or not the patient was covered by Medicaid, or directly or indirectly paid the doctor. Subsequent cases applying the *Miller* test have failed to resolve the faculty-physician issue and have left this Court deeply divided.

¶39. The first case applying the *Miller* test was *Sullivan v. Washington*, 768 So.2d 881 (Miss. 2000), decided only two months later. In *Sullivan*, the plaintiffs were able to survive summary judgment and won a jury verdict award against the physicians. *Id.* at 882. On appeal, we reversed and rendered, holding that the physicians were employees of UMMC, and thus were personally immune from liability pursuant to the MTCA. *Id.* at 886. In *Sullivan*, we noted that the patient was covered under Medicaid and did not choose any particular doctor. *Id.* at 884. This fact was important in all but the fourth prong of the *Miller* test. *Id.* at 884-86. Another important factor was that the faculty-physician had merely supervised the resident-physician who actually assisted in the operation. *Id.* This fact was similarly important in all but the fourth prong of the *Miller* test. *Id.* Other important factors were that UMMC exercised a certain degree of control over the two physicians, there was no private-patient relationship established, and neither physician received payment from the patient. *Id.*

¶40. The next case was *Smith v. Braden*, 765 So.2d 546 (Miss. 2000), decided on August 24, 2000, one week after *Sullivan*. Just as this Court had done in *Miller*, we reversed a grant of summary judgment in favor of the physician because there might remain a triable issue of material fact. *Id.* at 556-57. We concluded that the record before us made it impossible to fully and meaningfully apply the *Miller* test, and we remanded with instructions that the trial court do so. *Id.*

¶41. Four months after *Braden*, this Court decided *Carter v. Harkey*, 774 So.2d 392 (Miss. 2000). As this Court had done in *Miller* and *Braden*, we reversed a grant of summary judgment in favor of the physician because there might remain triable issues of material fact. *Id.* at 396. We further noted that the trial court did not have the benefit of *Miller* when trying to determine whether the physician was an

employee, protected under the MTCA, so on remand we instructed the trial court to reconsider its findings, based on the *Miller* factors. *Id.* We further noted that *Miller* and *Braden* were factually distinguishable from *Sullivan* in two ways. *Id.* First, in *Miller* and *Braden* the faculty-physicians actually performed the surgery themselves, while in *Sullivan* the faculty-physician only supervised. *Id.* Second, in *Miller* and *Braden* the faculty-physicians were in some way compensated for the surgery, while in *Sullivan* the faculty physician received no payment from the Medicaid patient. *Id. Carter* further presented a slightly different wrinkle in that the faculty-physician actually performed the surgery at Mississippi Methodist Rehabilitation Center, which had an "affiliation agreement" with UMMC whereby UMC faculty-physicians "may be called upon to consult and operate upon patients admitted to MMRC for the purposes of providing medical care, teaching, and service." *Id.* at 394. We did not say whether this fact was important.

¶42. Next this Court decided *Knight v. McKee*, 781 So.2d 121 (Miss. 2001). In *Knight,* we affirmed the circuit court's granting of summary judgment in favor of the faculty-physician and the resident-physician. *Id.* at 122. We held that resident-physicians at UMMC "are, as a matter of law, state employees for purposes of the MTCA." *Id.* (citing *Owens v. Thomae*, 759 So.2d 1117, 1122 (Miss. 1999); *Pickens v. Donaldson*, 748 So.2d 684, 889 (Miss. 1999)). The faculty-physician was deemed to be an employee as well because at all pertinent times he was employed by UMMC and was acting according to the terms and conditions of his contract. *Id.* Further, as a full-time employee of UMMC, he had never engaged in the practice of medicine outside the course and scope of his employment. *Id.* He was a supervising teacher and trainer of residents and did not receive any compensation from any person or entity other than UMMC. *Id*. Because both physicians were indisputably employees and not independent contractors, we found it unnecessary to apply the *Miller* test. *Id.* The real issue on appeal was whether the purchase of professional liability insurance by the physicians in excess of the limits imposed by the MTCA, waived their immunity protection. *Id*. As was discussed supra in Issue II, we said it did not. *Id.*

¶43. Finally, *Conley v. Warren*, 797 So.2d 881 (Miss. 2001), was handed down last year.[1] In *Conley*, this Court reversed the circuit court's granting of summary judgment in favor of the UMMC faculty-physician, as we had done in *Miller*, *Braden*, and *Carter*, because there were genuine fact issues as to whether the physician was acting as a State employee or private physician at the time of the surgery. *Id.* at 884. We noted that summary judgment was granted in that case prior to this Court's decision in *Miller*. *Id.* at 882. We further noted that *Miller* and *Braden* presented the same issue, namely, "whether faculty physicians of UMMC who engage in clinical outpatient practice under the general auspices of the University, for which they are compensated, are State employees acting within the course and scope of their employment for purpose of the MTCA." *Id.* at 883. In *Conley*, just as in the case sub judice, the faculty-physician was the chief surgeon attending the operation, but was simultaneously teaching the resident-physician who was present. *Id.* at 882. We once again determined that the record was *not* sufficiently developed for a full and meaningful application of the *Miller* factors. *Id.* at 883. We held that: "The trial court is in a better position to adequately examine the facts and issues of this case since it is not limited by the underdeveloped record which is before this Court." *Id.*

¶44. Analyzing the short history of *Miller* and its progeny, this is where we are. **First**, in all of these cases, the judgment of the court was entered prior to our decision in *Miller*. **Second**, the only time this Court has actually applied the *Miller* test, factor by factor, is in *Sullivan*. In *Knight*, we did not apply the *Miller* test because it was inapplicable, since the faculty-physician was paid solely by the State. In *Miller*, *Braden*, *Carter,* and *Conley*, we reversed summary judgment in favor of the faculty-physicians, finding it premature because there might remain triable issues of material fact. **Third**, in *Sullivan*, we applied the

*Miller* test and concluded that the faculty-physician was a State employee. **Fourth**, the last time we addressed this issue, we stated that the faculty-physician is not protected by the MTCA if he "acted as an independent contractor in the treatment of his patient." *Conley*, 797 So.2d at 883. **Fifth** and finally, while we have only applied the *Miller* factors once in a case before us, we have yet to review a circuit court's application of the factors.

¶45. In sum, this is the current state of the law. If the record is not sufficiently developed to determine the employment status of the faculty-physician, this Court will reverse and remand so the trial court can apply the *Miller* test, unrestricted by the limited record before us on appeal. However, as in *Knight*, if the faculty-physician is paid solely by the State, is at all times acting in accordance with his contract, and never acted outside the course and scope of his employment, the faculty-physician is an employee. Or if the same facts exist, as existed in *Sullivan*, the faculty-physician is an employee. In the case sub judice, we can affirmatively hold that Dr. Tsang was at all times an employee of the State, relying either on our decision in *Sullivan* or in *Knight*.

¶46. In *Sullivan*, we applied the *Miller* test and determined the faculty-physician was a state employee because of the following facts: (1) the faculty-physician was only supervising, not actually performing the operation; (2) the patient was covered by Medicaid; (3) the patient did not choose any particular doctor; (4) there was no private-patient relationship established; (5) UMMC exercised a certain degree of control over the faculty-physician; and (6) the faculty-physician did not receive payment from the patient.

¶47. In the case before us, Dr. Tsang was teaching and supervising Dr. Long, a fellow in training, and not actually performing the operation. Watts was covered by Medicaid. Watts did not choose Dr. Tsang to be his physician. There was no private-patient relationship established between Watts and Dr. Tsang. At all time Dr. Tsang was under the control of UMMC by contract and could work only at UMMC or affiliated sites. Dr. Tsang did not receive payment from Watts. In fact, pursuant to the point system for compensation used for distributing patient revenues from UMMC, Dr. Tsang received a certain amount of points for supervising the procedure. He received those points regardless of whether Watts paid in full, Medicaid paid, or no one paid. Thus, under *Sullivan*, Dr. Tsang is a state employee.

¶48. In *Knight,* the faculty-physician was deemed to be an employee as well because at all pertinent times he was employed by UMMC and was acting according to the terms and conditions of his contract. Further, as a full-time employee of UMMC, he had never engaged in the practice of medicine outside the course and scope of his employment. He was a supervising teacher and trainer of residents and did not receive any compensation from any person or entity other than UMMC.

¶49. In the case before us, Dr. Tsang was at all pertinent times employed by UMMC and acting according to the terms and conditions of his contract. Dr. Tsang was a full-time faculty member at UMMC and had never engaged in the practice of medicine outside the course and scope of his employment. Dr. Tsang was a supervising teacher and trainer of residents (interns and fellows as well) and did not receive compensation from any person or entity other than a State entity. In *Knight,* we determined that the faculty-physician was indisputably an employee; thus, the application of the *Miller* test was unnecessary. We here likewise determine that Dr. Tsang was a state employee.

## CONCLUSION

¶50. UAS, as it existed at the time of Watts's injury, was an instrumentality of the State. Dr. Tsang did not

waive immunity by acquiring personal liability insurance. Dr. Tsang was a state employee at all times relevant to this action. Thus, we affirm the judgment of the Hinds County Circuit Court, First Judicial District, granting summary judgment in favor of Dr. Tsang.

¶51. **AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., WALLER, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ AND EASLEY, JJ.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶52. Bill Watts walked into the hospital to be treated for pain in his back and abdomen, only to be pushed out in a wheelchair as a complete paraplegic. His life is devastated, his family is devastated, and now he is stripped of his right of recovery because the majority says that insurance does not waive immunity, and more importantly, that an employee, who works for a private corporation that is an independent contractor with insurance, and who is allowed to work in a hospital, gets total immunity. This is contrary to our previous decisions, and accordingly, I respectfully dissent.

¶53. I disagree with the majority that UAS is a state entity. UAS is a private entity of which Dr. Tsang was an employee. With our previous decisions of *Sullivan v. Washington*, 768 So.2d 881 (Miss. 2000); *Miller v. Meeks,* 762 So.2d 302 (Miss. 2000); *Pickens v. Donaldson*; 748 So.2d 684 (Miss. 1999); *Owens v. Thomae*, 759 So.2d 1117 (Miss. 1999), it still adds up that, just as in *Womble v. Singing River Hosp.,* 618 So.2d 1252 (Miss. 1993) (albeit a pre-Tort Claims Act case), the employer who is an independent contractor and a private corporation, is responsible for the torts committed by its employee, and therefore, **there is no immunity**. *Id.* Miss. Code Ann. § 11-46-1(f) states that "[t]he term 'employee' shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the state or a political subdivision. . ." Miss. Code Ann § 11-46-1(f) (2002). UAS is a private corporation, in which neither the State of Mississippi nor UMMC have ownership interest. UAS is employed by UMMC as an independent contractor. When Dr. Tsang treated Watts, he was the employee of UAS primarily, and UMMC secondarily. Watts did not have to proceed under the MTCA; clearly, there is no immunity.

¶54. In light of the four cases previously mentioned and the five-part test to determine employment status under a summary judgment, this case still boils down to the fact that Dr. Tsang was an employee of UAS and not UMMC at the time he treated Watts. There should not be total and absolute immunity from any and all negligence in this case. Although he did share his duties and he did teach, Dr. Tsang can be excluded under Miss. Code Ann. §  11-46-1(f) as an independent contractor. The facts of this case are the same as *Womble* in which we stated that if one is an independent contractor then he does not have immunity. *Womble*, 618 So.2d at 1262. While it is true that patients come through the hospital and UMMC may have control over the doctors to some extent, such as which patients they will see, the hospital does not control Dr. Tsang's decisions on how to treat a patient. Further, the hospital does not control the corporation, UAS, or how it handles its employees. Even more indicative of its status as an independent contractor is the fact that UAS provided insurance coverage for Dr. Tsang, seemingly under a general provision for UAS employees as well as individually, and collected and paid to the state and federal government taxes for its employees as well as itself. In light of these facts, it is clear that Dr. Tsang was an employee of UAS, an independent contractor, when he treated Watts.

¶55. The majority attempts to discount the applicability of *Womble* to the case sub judice in its statement that "the purchase of personal medical malpractice insurance **by an employee of the State** does not waive immunity." *Knight v. McKee*, 781 So.2d 121 (Miss. 2001) (emphasis added). As this discussion indicates, Dr. Tsang was acting as an employee of UAS, not the State, when treating Watts, and therefore *Knight* does not apply. (For further discussion on the issue, see *id.* at 123 (McRae, P.J., dissenting)).

¶56. At the least, there was a joint venture between UAS and UMMC. The contract between UMMC and UAS, or even the contract between UAS and Dr. Tsang himself, clearly indicate that this is a case that should be outside the Tort Claims Act. When money is collected outside of an entity, whether they call it a medical practice group or whatever, it is still an entity; it still pays taxes as if it is a private entity. Public entities do not pay taxes. The majority overlooks the fact that UAS is a private entity and that Dr. Tsang received W-2 forms from UAS on an annual basis, and UAS withheld FICA and state income tax, as well as federal income taxes from Dr. Tsang's paychecks. With this in mind, is the State of Mississippi charging state income tax to a "public entity" or "private entity"? The State can only charge state income tax to a private entity.

¶57. The statute is clear as to immunity in this case. There is none. *See* Miss. Code Ann. § 11-46-1(f). As I have opined in the past in cases of this nature, I would reverse the total immunity that the majority and the trial court have now given Dr. Tsang in his treatment of patients, as well as the individual immunity since Dr. Tsang had a personal liability insurance policy, even if immunity did apply. For the majority to say it is not applicable is disingenuous. For these reasons, I dissent.

**DIAZ AND EASLEY, JJ., JOIN THIS OPINION.**

1. This Court recently handed down *Bennett v. Madakasira,* 821 So.2d 794 (Miss. 2002) on March 21, 2002. As in *Miller*, *Braden*, *Carter,* and *Conley*, we reversed the grant of summary judgment in favor of the faculty-physicians because there remained a material issue as to the faculty-physician's employment status and remanded for further proceedings. Although the Court of Appeals applied the *Miller* test in *Gilchrist v. Veach*, 807 So.2d 485 (Miss. Ct. App. 2002), that case did not present the same issue that is currently before us.