858 So.2d 168 (2003)
Hattie Pearl BROWN, Appellant,
v.
Edward T. WARREN, M.D. and Carolyn L. Bigelow, M.D., Appellees.
No. 2002-CA-00274-COA.
Court of Appeals of Mississippi.
October 21, 2003.
*170 Dana J. Swan, Clarksdale, attorney for appellant.
Joseph L. McNamara, Jackson, Stephen P. Kruger, Jan F. Gadow, Ridgeland, John Michael Coleman, Saltillo attorneys for appellee.
Before KING, P.J., BRIDGES and IRVING, JJ.
IRVING, J., for the court.
¶ 1. Mrs. Hattie Pearl Brown filed a medical malpractice suit against Drs. Edward T. Warren and Carolyn Bigelow. The doctors responded with a motion for summary judgment, and the Circuit Court of Hinds County granted the motion. Mrs. Brown, arguing in this appeal that the trial court erred in determining that the doctors were employees of the University of Mississippi Medical Center and not independent contractors, challenges the propriety of the circuit court's decision. Mrs. Brown also argues that the trial court erred in not finding that the doctors' possession of liability insurance waived sovereign immunity to the extent of their insurance.
*171 ¶ 2. We reject these arguments and affirm the trial court.

FACTS
¶ 3. On September 11, 1992, Mrs. Hattie Pearl Brown was admitted to the University of Mississippi Medical Center (UMMC) for chest pain. Upon being admitted, Mrs. Brown came under the care of Dr. Warren, a cardiovascular surgeon. An evaluation of Mrs. Brown revealed that she suffered from acute heart disease. She subsequently began treatment of her heart problem with medication and other non-surgical procedures. When this treatment did not improve Mrs. Brown's condition, she underwent heart bypass surgery. During her initial treatment and surgery, Mrs. Brown's primary physician was Dr. Warren.
¶ 4. Several days after the operation, Mrs. Brown experienced an abnormal decrease in the number of platelets in her blood. At this point, Dr. Warren referred Mrs. Brown to Dr. Carolyn Bigelow, a hematologist. Upon evaluating Mrs. Brown's reduced platelet count, Dr. Bigelow diagnosed Mrs. Brown as having thrombocytopenia which allegedly evolved from ingestion of Heparin, one of the medications that was prescribed for Mrs. Brown during treatment of her heart disease. The thrombocytopenia resulted in the formation of blood clots which impeded the blood flow to Mrs. Brown's lower extremities. This occurrence necessitated the amputation of both of Mrs. Brown's legs above the knee.
¶ 5. Mrs. Brown filed a complaint on September 9, 1994, against Dr. Warren, Dr. Bigelow and others for medical malpractice. Drs. Warren and Bigelow both answered the complaint. In his answer, Dr. Warren affirmatively asserted that he was acting within the scope of his employment with UMMC and that, as a result, he was statutorily immune from liability. He later filed a motion to dismiss, or in the alternative, for summary judgment, asserting sovereign immunity. Dr. Bigelow subsequently joined this motion and was also granted permission to amend her answer to assert sovereign immunity as an affirmative defense. The Hinds County Circuit Court granted the motion and entered a final judgment and order dismissing both Drs. Warren and Bigelow with prejudice. Other facts will be related during the discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 6. The grant of summary judgment is proper if there is no genuine issue of material fact. M.R.C.P. 56(c). The standard of review of a trial court's grant of a motion for summary judgment is de novo. Corey v. Skelton, 834 So.2d 681, 684(¶ 7) (Miss. 2003). The burden of demonstrating that there is no genuine issue of material fact falls upon the party requesting the summary judgment. Id. The court must carefully review all evidentiary matters before itadmissions in pleadings, answers to interrogatories, depositions, affidavits, etc. in the light most favorable to the party against whom the motion for summary judgment is made. Id.
When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleadings; his response must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed.
*172 Id. at 684 (citing Miller v. Meeks, 762 So.2d 302, 304(¶ 3) (Miss.2000)).
¶ 7. In the resolution of the issue before us, we first look to see which, if any, of the statutory enactments on sovereign immunity apply to the case sub judice. The answer to this inquiry will depend on (1) when the alleged acts of negligence occurred, and (2) what law on sovereign immunity was in effect when those alleged acts of negligence occurred. In other words, the Mississippi law on sovereign immunity, if any, which was in effect during the occurrence of the alleged negligent acts govern the legal consequences flowing therefrom. Therefore, this Court must ascertain the time frame in which the alleged negligent acts of Drs. Warren and Bigelow occurred, as substantiated by the summary judgment evidence.
¶ 8. Both parties concede that any acts of negligence occurring in this case on or after September 16, 1992, would be governed by Mississippi's sovereign immunity law as enacted by the 1992 special session of the legislature. However, Mrs. Brown asserts that the aforementioned statutory provisions would not govern any alleged acts of negligence committed by Dr. Warren before September 16, 1992. Consequently, she argues that the trial court erred when it granted sovereign immunity to Dr. Warren for any alleged acts of negligence occurring before September 16, 1992, because no sovereign immunity existed or was in effect during this period of treatment.
¶ 9. Mrs. Brown explains that she was admitted to UMMC on September 11, 1992, and was under Dr. Warren's care from this date through September 15, 1992. She asserts that Dr. Warren committed various acts of negligence during this period. Mrs. Brown argues that there was no sovereign immunity after Presley v. Mississippi State Highway Commission, 608 So.2d 1288 (Miss.1992) (holding that section 11-46-6 was unconstitutional as an attempt to freeze the common law of Mississippi as it existed in 1982) until the legislature, through a special session, enacted new laws to supplant that which had been rendered unconstitutional. Mrs. Brown asserts that this legislation did not become effective until September 16, 1992; therefore, no sovereign immunity existed between the supreme court's handing down of Presley on August 31, 1992, and September 16, 1992, the date on which the special session legislation became effective.
¶ 10. Mrs. Brown is mistaken in her position as to when sovereign immunity was no longer available to government entities in this state. It is true that the Presley court announced that sovereign immunity would not be extended beyond the date of the decision which was August 31, 1992, but in the case of Mississippi Transportation Commission v. Allday, 726 So.2d 563, 566(¶ 9) (Miss.1998), the Allday court held that the Presley ruling did not become effective until the petition for rehearing was denied. That date was December 3, 1992. Id. at 566. Therefore, sovereign immunity was available to Drs. Warren and Bigelow throughout the period of their treatment of Mrs. Brown, assuming of course they were employees of UMMC. That is the matter we next address.
¶ 11. Both Drs. Warren and Bigelow were under contract with the Board of Trustees of State Institutions of Higher Learning for the period of Mrs. Brown's treatment. Dr. Warren was hired as an associate professor of surgery in the school of medicine at an annual salary of $62,685 for the period beginning July 1, 1992 and ending June 30, 1993. Dr. Bigelow was hired as an assistant professor of medicine in the school of medicine at an annual salary of $57,750 for the period beginning *173 July 1, 1992 and ending June 30, 1993. Each contract provided that the doctors would be permitted to earn additional income from medical practice and could retain one hundred percent of earnings from medical practice up to a total income of $120,000. Any income in excess of this amount would be divided evenly between UMMC and the doctors.
¶ 12. The criteria for determining whether a physician employed at UMMC is an employee or an independent contractor for purposes of immunity is set forth in Miller v. Meeks, 762 So.2d 302 (Miss.2000). According to Miller, the factors to be examined and weighed are: (1) the nature of the function performed by the employee; (2) the extent of the state's interest and involvement in the function; (3) the degree of control and direction exercised by the state over the employee; (4) whether the act complained of involved the use of judgment and discretion; and (5) whether the physician received compensation, either directly or indirectly, from the patient for professional services rendered. Id. at 310(¶ 20). These factors must be applied on a case by case basis, for a physician may wear two hats.
¶ 13. It is clear from the evidence in this case that both Drs. Warren and Bigelow wore two hats, one as employees of UMMC and one as physicians engaged in a separate private practice. Therefore, our task is to determine which hat Drs. Warren and Bigelow were wearing during their treatment of Mrs. Brown. In our effort to accomplish this task, we next discuss the Miller factors.
1. The Nature of the Function Performed by the Employee
¶ 14. In the case sub judice, Mrs. Brown contends that because Dr. Warren was actively practicing surgery, made the decision to keep her on Heparin, was the chief surgeon for her operative procedure, prescribed drugs for her, and continued to follow her treatment, the nature of the function he performed weighs in favor of finding that he was an independent contractor. She makes no such argument in regard to Dr. Bigelow.
¶ 15. Drs. Warren's and Bigelow's duties in their capacity as professors with UMMC included classroom and practical instruction of medical students and residents, treatment of patients at UMMC and affiliate sites, and other duties as assigned by UMMC. In their supervisory roles, Drs. Warren and Bigelow monitored and advised fellows and medical doctors certified in internal medicine who are studying at UMMC to obtain a specialty in the medical field. In some instances, Drs. Warren and Bigelow would themselves engage in the patients' treatment or surgical procedures while fellows accompanied them and observed.
2. The Extent of the State's Interest and Involvement in the Function
¶ 16. Regarding this second factor, Mrs. Brown argues that since Dr. Warren made decisions concerning Mrs. Brown's medical treatment, he must be an independent contractor rather than an employee. She makes no mention of Dr. Bigelow or what degree of interest the state has in the role played by Dr. Bigelow.
¶ 17. It is not debatable that the State of Mississippi has a keen interest in seeing to it that adequate medical services are available to its citizens. According to Mississippi Code Annotated section 37-115-31 (1972), the operational purpose of UMMC is to "serve the people of Mississippi generally" as well as "provide care and services to the indigent and persons on Medicaid." By providing cardiovascular treatment and surgery to Mrs. Brown, a Medicaid/Medicare patient, Dr. Warren *174 was carrying out this operational purpose. Additionally, Dr. Bigelow provided services and treatment to Mrs. Brown relating to her blood circulation. Her job was also within the operational purposes of the hospital.
¶ 18. Moreover, UMMC was established as a teaching hospital. Miss.Code Ann. § 37-115-25 (Rev.2001). Drs. Warren and Bigelow were engaged in teaching and training residents while providing medical and surgical services to Mrs. Brown. Our supreme court has acknowledged the state's interest in cases of this nature by stating:
It is very important that faculty physicians supervise the progress of interns and residents. This provides the training necessary to ensure that Mississippi has a ready pool of competent physicians. Likewise, the resident must be able to practice medicine under the guidance of a learned physician in order to master his or her profession. The State has a strong interest in maintaining such a practical and educational environment, meeting the needs of both the physicians and the patients.
Sullivan v. Washington, 768 So.2d 881, 885(¶ 19) (Miss.2000).
3. The Degree of Control and Direction Exercised by the State over the Employees
¶ 19. Mrs. Brown argues that the state lacks control over Drs. Warren and Bigelow because an attending physician has the final say with respect to medical procedures and these doctors, as attending physicians, made such decisions in their treatment of Mrs. Brown. She therefore concludes that the two doctors are independent contractors.
¶ 20. While it is true that the doctors made the necessary medical decisions regarding Mrs. Brown's treatment, the Board of Trustees of State Institutions of Higher Learning exercised a reasonable amount of control over Drs. Warren and Bigelow. The doctors were not allowed to keep all of the income which they made above their base salary. UMMC had the right to direct the details and manner of their work schedules and the right to supervise and inspect the services provided by both doctors. It additionally furnished the means and instruments necessary for their work and the patients for whose care they were paid their contractual salaries. Moreover, the state controlled the hospital premises and had the power to terminate the doctors' contracts.
¶ 21. The fact that Drs. Warren and Bigelow use their special training and medical judgment is inconsequential. That fact alone does not necessarily make the doctors independent contractors. A certain amount of discretion is necessary for the doctors to perform their duties as a physician.
4. Whether the Act Complained of Involved the Use of Judgment and Discretion
¶ 22. Mrs. Brown asserts that, based on the medical decisions Drs.Warren and Bigelow regularly make as physicians, this factor demonstrates that the doctors are independent contractors instead of employees of UMMC. However, our supreme court has previously stated that, while the amount of judgment and discretion a doctor exercises in the treatment, observation, and diagnosis of patients is a consideration, it is not determinative of his status. See Sullivan, 768 So.2d at 885(¶ 22). In fact, our supreme court also pointed out in Sullivan that:
Virtually every act performed by a person involves the exercise of some discretion. Obviously, a professional necessarily *175 retains a significant amount of discretion in the operation of his profession. This is especially true of physicians who are bound to exercise their judgment without interference from others. The Hippocratic Oath requires that the physician "use [his] power to help the sick to the best of [his] ability and judgment." Section 6 of the American Medical Association's "Principles of Medical Ethics" states, "A physician should not dispose of his services under terms or conditions which tend to interfere with or impede the free and complete exercise of his medical judgment and skill...."
Id. Therefore, in accordance with the supreme court's decision in Sullivan, the fact that Drs. Warren and Bigelow exercised their professional judgment and discretion through their teaching and in their treatment of patients, does not mean that they are independent contractors.
5. Whether the Physicians Received Compensation, Either Directly or Indirectly, from the Patient for Professional Services Rendered
¶ 23. Mrs. Brown asserts that this factor indicates that the doctors are independent contractors. To support her assertion, she proceeds to recite the specifics of Dr. Warren's contract and points out that Dr. Bigelow testified that Medicaid and Medicare patients are a source of income for her association. Mrs. Brown is correct in this assertion. However, the fact that Medicaid and Medicare patients are a source of income for the doctors' association does not prove that, in this specific case, the doctors received additional remuneration for the services rendered to Mrs. Brown. In this regard, we note that Dr. Warren stated in his affidavit that:
At all times during my treatment of Mrs. Brown, including the surgery performed on her, I was acting as a staff cardiothoracic surgeon for UMC and did not have a private-patient relationship with Mrs. Brown; rather, I was serving a public function and providing care for a Medicaid patient. Also, I did not choose Mrs. Brown as a patient, nor did she choose me as a physician. In regard to compensation, Mrs. Brown was a Medicaid patient from whom I received no remuneration for my professional services.
These assertions by Dr. Warren were not rebutted. While Dr. Warren did not say that he did not receive any remuneration for his services, only that he did not receive any remuneration from Mrs. Brown, we do not find any evidence in the record that either Dr. Bigelow or Dr. Warren, directly or indirectly, billed the government for the services that they rendered to Mrs. Brown.
¶ 24. In weighing all the Miller factors and applying them to the case at bar, we cannot say that a genuine issue of material fact exists as to whether Drs. Warren and Bigelow were acting as independent contractors during the time of their treatment of Mrs. Brown. The un-controverted evidence is that they were employees of UMMC. In fact, Mrs. Brown does not allege that the doctors wore two hats and that, at the pertinent time in question, they were wearing their private hat. Her allegation is that the doctors were independent contractors period. While it is clear in the record that the doctors' contracts allowed them to wear two hats and that they did wear two hats in that they treated patients in a private clinic and received remuneration for the treatment, there is simply no evidence in the record placing in issue the nature of the hat worn by these doctors during the treatment of Mrs. Brown.
*176 ¶ 25. Paul Trussell, the director of human resources for UMMC, stated in an affidavit in support of the motion for summary judgment on Dr. Bigelow's behalf that all treatment provided to Mrs. Brown by Dr. Bigelow was provided in the course and scope of Dr. Bigelow's employment with the Board of Trustees of State Institutions of Higher Learning. Nothing in the record refutes this allegation. As we have previously observed, there is a plethora of evidence that the doctors were employees of UMMC. We therefore find no merit in Mrs. Brown's argument on this issue.
¶ 26. Having determined that Drs. Warren and Bigelow were employees of UMMC and that there is no evidence indicating that they were acting in a different capacity when they treated Mrs. Brown, we turn to the sovereign immunity law that was in effect at that time. The applicable statute is Mississippi Code Annotated section 11-46-7(2) as amended in 1991. When the alleged acts of medical malpractice occurred, section 11-46-7(2) read as follows:
From and after July 1, 1992, as to the state, and from and after October 1, 1992, as to political subdivisions, an employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.

Miss.Code Ann. § 11-46-7(2) (Supp.1991) (emphasis added).
However, Mississippi Code Annotated section 11-46-5 as amended in 1991 states that "it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment."
¶ 27. Mrs. Brown argues that she has overcome the presumption that Drs. Warren and Bigelow were acting within the course and scope of their employment. We failed to locate any evidence in the record in opposition to the motion for summary judgment which persuades us that Mrs. Brown succeeded in either overcoming the presumption or creating a genuine issue as to whether the presumption had been overcome. As we have already observed, there is much uncontradicted evidence that the doctors were employees of UMMC at the time the alleged acts of negligence occurred.
Liability Insurance
¶ 28. Finally, Mrs. Brown argues that the existence of liability insurance waives Dr. Warren's and Dr. Bigelow's immunity to the extent of their coverage. She relies on Pickens v. Donaldson, 748 So.2d 684 (Miss.1999) as authority. She explains that, based upon Pickens, the Mississippi Torts Claims Act does not apply to this action and that the now repealed Mississippi Code Annotated section 11-46-16(2) applies instead. We agree with Mrs. Brown that the Mississippi Tort Claims Act does not apply since that Act became effective April 1, 1993, and the acts here occurred in September 1992. Mrs. Brown is also correct that the now repealed section, 11-46-16(2), applies, but this fact provides her no relief because the section, by its plain terms, spoke to the liability insurance of the governmental entity, not the liability insurance of the governmental employee. That section, as then written, read in pertinent part as follows:
If any governmental entity has in effect liability insurance to cover wrongful or tortious acts or omissions of such governmental entity or its employees, such *177 governmental entity may be sued by anyone affected to the extent of such insurance carried.

See Pickens, 748 So.2d at 687(¶ 11) (emphasis added).
¶ 29. Based upon the evidence before this Court, we affirm the ruling of the trial court granting summary judgment to Drs. Warren and Bigelow on the grounds that they were employees of UMMC during their treatment of Mrs. Brown, and thus immune from liability. We further find no merit in Mrs. Brown's argument regarding the waiver of sovereign immunity due to the doctors' acquisition of liability insurance.
¶ 30. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.